UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------
TERRA FIRMA INVESTMENTS (GP) 2 LIMITED,
and TERRA FIRMA INVESTMENTS (GP) 3
LIMITED,

                Plaintiffs,

        -against-

CITIGROUP INC., CITIBANK, N.A., CITIGROUP
GLOBAL MARKETS LIMITED and CITIGROUP
GLOBAL MARKETS INC.,
                Defendants.
-----------------------------------------------------------------



09 CIV 10459

JUDGE RAKOFF

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE THAT, pursuant to 12 U.S.C. § 632 and 28 U.S.C. §§ 1441 and 1446, defendants Citigroup Inc., Citibank, N.A. ("Citibank"), Citigroup Global Markets Limited, and Citigroup Global Markets Inc. (collectively, "Defendants" or "Citi") hereby remove this action from the Supreme Court of the State of New York, County of New York. A copy of the Summons and Complaint ("Cmplt.") is attached as Exhibit A.

The grounds for removal are as follows:

1.    Plaintiffs are two hedge funds based in the Channel Islands that assert claims relating to their purchase of an English-listed company – EMI Group plc ("EMI") – allegedly arranged and financed by Defendants in London, England.

2.    Defendants include Citibank, a corporation organized under the laws of the United States. The Complaint expressly acknowledges that Defendant Citibank "is a chartered national banking association." (Cmplt. ¶ 23.)

3.    The Complaint concerns matters relating to international banking and finance.  The claims alleged arise out of Defendants' banking relationship with EMI, centered in London, and Defendants' financing of Plaintiffs' acquisition of EMI.

4.    Accordingly, on its face, the Complaint is removable pursuant to 12 U.S.C. § 632 ("the Edge Act").

5.    In filing this Notice of Removal, Defendants do not waive any defenses that may be available to them.

**This Court Has Jurisdiction Under the Edge Act**

6.    This Court has original jurisdiction over this action.  The Edge Act provides:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, . . . or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions . . . shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for removal of causes otherwise provided by law.

12 U.S.C. § 632.

7.    A threshold requirement for Edge Act removal is that "a corporation organized under the laws of the United States is a party." *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 213 (S.D.N.Y. 2005); *see also Pinto v. Bank One Corp.*, No. 02 Civ. 8477, 2003 WL 21297300, at *2 (S.D.N.Y. June 4, 2003).

8.    There can be no dispute that this requirement is satisfied here.  The Complaint expressly alleges that Defendant Citibank "is a chartered national banking

association." (Cmplt. ¶ 23.) A chartered national banking association is a corporation organized under the laws of the United States. *See* 12 U.S.C. § 24. Thus, Citibank is entitled to remove actions against it pursuant to the Edge Act. *See, e.g.*, *In re Lloyd's American Trust Fund Litig.*, 928 F. Supp. 333, 341 (S.D.N.Y. 1996) (holding that Edge Act removal by Citibank was proper).

9. The only other requirement for Edge Act jurisdiction is that the lawsuit *either* arises "out of transactions involving international or foreign banking," *or* "out of other international or foreign financial operations." 12 U.S.C. § 632; *In re Lloyd's*, 928 F. Supp. at 341; *Lemgruber*, 385 F. Supp. 2d at 213. These requirements are construed broadly. This Court has jurisdiction where "*any* part of [a suit] arises out of transactions involving international or foreign banking." *In re Lloyd's*, 928 F. Supp. at 338 (emphasis added) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786 (2d Cir. 1980)).

10. Under any reasonable reading, the Complaint concerns *both* "international or foreign banking" *and* "international or foreign financial operations."

11. The Complaint describes Defendants collectively as "a major commercial and investment bank." (Cmplt. ¶ 4.) It alleges how, during the period 2000 through 2007, Citi "deepened its relationship with EMI, serving as book-runner, banker and commercial lender financing EMI's debt, and also providing merger and acquisition advisory services and acting as EMI's broker." (*Id.* ¶ 7.) Indeed, according to the Complaint, by the end of 2003, "Citi had emerged as the lead bank for EMI." (*Id.* ¶ 55.) The Complaint goes on at length to allege particulars concerning Citi's banking relationship with EMI. (*E. g.*, *id.* at ¶¶ 48-58.)

12.     In May 2007, according to the Complaint, Plaintiffs purchased EMI. (*Id.* ¶ 1.) In connection with that acquisition, Citi loaned Plaintiffs approximately £3 billion. (*Id.* ¶ 124.) Plaintiffs' claims are based, in significant part, on the circumstances under which Citi agreed to lend this money to Plaintiffs and Citi's subsequent management of the loans. (*See, e.g., id.* ¶¶ 125, 148-54.)

13.     The type of lending activity alleged in the Complaint – both to EMI (through May 2007) and to Plaintiffs and their affiliates (thereafter)  – is precisely the type of activity that qualifies as "banking" for purposes of conferring subject matter jurisdiction on federal courts under the Edge Act. *See Nacional Financiera, S.N.C. v. Chase Manhattan Bank, N.A.*, No. 00-CIV-1571, 2001 WL 327159, at *3 (S.D.N.Y. Apr. 4, 2001) ("loan agreements" and "letters of credit" constitute "'traditional' banking activities" under the Edge Act); *Pinto v. Bank One Corp.*, No. 02 Civ. 8477, 2003 WL 21297300, at *3 (S.D.N.Y. June 4, 2003) (the making of loans constitutes traditional banking activity).

14.     Even if, contrary to its express allegations, the Complaint did not concern banking activity, removal under the Edge Act still would be warranted because the claims alleged involve "international or foreign financial operations."

15.     The Complaint describes in detail the auction process by which Plaintiffs purchased the shares of EMI. (Cmplt. *passim.*) The "financial operations" covered by the Edge Act specifically include the acquisition of stock. *Lemgruber*, 385 F. Supp. 2d at 215 n.13; *see also Stamm v. Barclays Bank of New York*, No. 96 Civ. 5158, 1996 WL 614087, at *2 (S.D.N.Y. Oct. 24, 1996) (finding removal proper where, even if parties'

transactions did not constitute banking, "they undoubtedly [fell] into the general statutory category of 'financial operations'").

16.　　Finally, it cannot be disputed that this case involves "international" or "foreign" activities.  The lawsuit concerns the circumstances under which the U.K. arm of a U.S. bank agreed to lend money to companies based in the Channel Islands to acquire a U.K.-listed public company.

**The Procedural Requirements for Removal Have Been Satisfied**

17.　　On December 11, 2009, Plaintiffs filed the Complaint in the Supreme Court of the State of New York, County of New York, Index No. 603737/2009.

18.　　The action is removable to this Court because the Southern District of New York embraces the place where the state court action is pending.  *See* 28 U.S.C. § 1441(a).

19.　　This Notice of Removal is being filed within thirty days of the date on which Defendants received, through service or otherwise, a copy of the initial pleading and, therefore, is timely pursuant to 28  U.S.C. § 1446(b).  Further, this notice is timely because, pursuant to 12 U.S.C. § 632, removal under the Edge Act may be made at any time before trial.

20.　　In accordance with 28 U.S.C. § 1446(d), Defendants promptly will file a copy of this Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of New York, and provide written notice of this filing to all adverse parties.

**WHEREFORE,** Defendants remove this action from the Supreme Court of New York, County of New York.

Dated:  December 23, 2009
         New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____

Brad S. Karp, Esq.
Theodore V. Wells, Jr., Esq.
Jay Cohen, Esq.
John F. Baughman, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.  (212) 373-3000
Fax  (212) 757-3990
bkarp@paulweiss.com
twells@paulweiss.com
jaycohen@paulweiss.com
jbaughman@paulweiss.com

*Attorneys for Defendants Citigroup Inc.,*
*Citibank, N.A., Citigroup Global Markets*
*Limited, and Citigroup Global Markets Inc.*

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. 603737/2009
Date Purchased December 11, 2009

-----------------------------------------------------------------X

TERRA FIRMA INVESTMENTS (GP) 2
LIMITED, and TERRA FIRMA INVESTMENTS
(GP) 3 LIMITED,

                         Plaintiffs,

          -against-

CITIGROUP, INC., CITIBANK N.A.,
CITIGROUP GLOBAL MARKETS LIMITED and
CITIGROUP GLOBAL MARKETS, INC.,

                        Defendants.

-----------------------------------------------------------------X

Plaintiffs designate
New York
County as the place of trial.

The basis of the venue is
3 of 4 Defendants'
County of Residence

**SUMMONS**

NEW YORK
COUNTY CLERK'S OFFICE

DEC 11 2009

NOT COMPARED
WITH COPY FILED

To:  See annexed service list

     **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and
to serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance, on the Plaintiff's Attorneys within 20 days after service of
the summons, exclusive of the day of service (or within 30 days after the service is
complete if this summons is not personally delivered to you within the State of New
York); and in case of your failure to appear or answer, judgment will be taken against
you by default for the relief demanded in the complaint.

Dated: December 11, 2009

                        BOIES, SCHILLER & FLEXNER LLP

                        By:  _David Boies_
                        David Boies
                        Christopher E. Duffy
                        575 Lexington Avenue
                        New York, New York 10022
                        (212) 446-2300

                        -and-

                        Jonathan H. Sherman
                        William C. Jackson
                        5301 Wisconsin Avenue, NW
                        Washington, DC 20015
                        (202) 237-2727
                        *Attorneys for Plaintiffs*

Defendants' Service List

Citigroup, Inc.
399 Park Avenue
New York, New York 10043

Citibank N.A
399 Park Avenue
New York, New York 10043

Citigroup Global Markets Limited
Citigroup Centre
33 Canada Sq., Canary Wharf
London E14 5LB, United Kingdom

Citigroup Global Markets, Inc.
388 Greenwich Street
New York, New York 10013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

TERRA FIRMA INVESTMENTS (GP) 2 LIMITED    :
(for and on behalf of the six limited partnerships    :
constituting the Terra Firma Capital Partners II    :
Fund), and TERRA FIRMA INVESTMENTS (GP)    :
3 LIMITED (for and on behalf of Terra Firma    :
Capital Partners III, L.P.),    :

        Plaintiffs,    :

             v.    :

CITIGROUP INC., CITIBANK N.A.,    :
CITIGROUP GLOBAL MARKETS LIMITED, and    :
CITIGROUP GLOBAL MARKETS, INC.    :

        Defendants.

Index No. *603737/2009*

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

     Plaintiffs Terra Firma Investments (GP) 2 Limited (for and on behalf of the six limited

partnerships constituting the Terra Firma Capital Partners II Fund), and Terra Firma Investments

(GP) 3 Limited (for and on behalf of Terra Firma Capital Partners III, L.P.), (collectively with

Terra Firma Investments (GP) 2 Limited, "Terra Firma") allege, with knowledge as to their own

actions and as to events occurring in their presence, and upon information and belief as to all

other matters, as follows:

### Introduction

     1.      This case is about a fraud committed by Citigroup, Inc. ("Citigroup") and three of

its wholly-owned subsidiaries, Citibank N.A. ("Citibank"), Citigroup Global Markets Ltd. ("Citi

Global Markets I") and Citigroup Global Markets, Inc. ("Citi Global Markets II", and

collectively, with Citigroup, Citibank, and Citi Global Markets I, "Citi"). The victim of the fraud

was Terra Firma, a leading private equity firm. Terra Firma purchased EMI in 2007. In

connection with that purchase, Citi served in multiple capacities: as investment advisor to EMI,

as lender to EMI, as broker to EMI and as sole financier to Terra Firma, extending approximately £ 2.5 billion in debt.

2.      Terra Firma has now discovered that in order to induce it to bid in a private equity auction for EMI, Citi misrepresented fundamental facts about that auction to Terra Firma— including misrepresenting that there was another bidder and the price at which that other bidder was bidding. Because of Citi's misrepresentations, Terra Firma paid a fraudulently inflated price for EMI, in the equity it invested and the debt it incurred. Indeed, had Terra Firma known about Citi's misrepresentations, Terra Firma would not have bid. Citi, on the other hand, earned approximately £ 92.5 million through its multiple capacities on the deal. Despite garnering those proceeds, Citi, during the entire period from May 2007 continuing to the present, has recklessly disregarded Terra Firma's rights and interests in connection with the EMI transaction and has in the process harmed Terra Firma.

3.      Terra Firma brings this action to recover its lost equity of billions of dollars, to obtain redress for injuries caused by Citi's actions, and seeks punitive damages over and above that amount to deter and punish Citi's egregious wrongdoing.

### Summary of the Action

4.      Citi, as a major commercial and investment bank, has provided private equity firms with a broad range of services including investment banking assistance (to assist the private equity firms in acquiring and selling companies), commercial and other lending services (to assist the private equity firms in financing those transactions), and the raising of money from pension funds and private individuals to invest in private equity funds. Over time, Citi has cultivated close relationships with most of the major private equity firms, including Terra Firma.

As a result, until it uncovered Citi's fraud, Terra Firma had grown to place substantial faith and trust in Citi's representations and actions.

5.      In May 2007, to chase ever increasing fees and income, Citi abused that trust and fraudulently deceived Terra Firma, resulting in Terra Firma's purchase of EMI.

6.      Between 2000 and 2007, EMI's financial health deteriorated. In an effort to arrest its declining fortunes, EMI explored a number of strategic options for the company. The core of these options was to combine EMI and another major record label, Warner Music ("Warner"). Over the seven-year period the two companies made a series of unsuccessful attempts to do just that.

7.      Over this same time, Citi deepened its relationship with EMI, serving as book-runner, banker and commercial lender financing EMI's debt, and also providing merger and acquisition advisory services and acting as EMI's broker. Citi's increasing involvement with EMI in many areas led to inherent conflicts, set Citi up to broker the private equity deal that is at the heart of this action, and made it possible for Citi to commit the fraud that induced that deal.

8.      In April 2007, a number of private equity firms expressed interest in purchasing EMI, and EMI, with the assistance of Citi among others, established an auction. Late in the process—after three firms had provided preliminary indications of interest—Citi contacted Terra Firma, asking it whether it wanted to participate. Over time it became clear that Citi could earn substantial fees that were available *only* if Terra Firma, as opposed to the other bidders, were to purchase EMI—including fees for financing the acquisition and for the securitization of EMI's music publishing business in which, prior to a deal, Citi had sought to participate but for which it had not been selected.

3

9.     As the auction date approached, all of the other private equity bidders that had indicated interest in the acquisition withdrew from the auction.  That withdrawal changed the very nature of the auction process:  in any auction to take a public company private, bidders initially indicate interest and do so at a range of prices.  During the auction process, multiple bidders create competitive tension and drive prices up; single bidders either need not submit a bid—on the theory that the absence of any other bidders says something negative about the company's value—or they have the freedom to price their bid as low as possible.  More to the point, if—as here—potential bidders are involved in the process, perform due diligence and then drop out of the sale process *en masse*, the signal to any remaining bidder is obvious:  the company is worth far less than the prices at which those other bidders indicated interest.  Contrariwise, the existence of other bidders—to say nothing of a specific bidding deadline and the amount of those other bids—can set a floor at which to bid.

10.     Thus, the decision by all of the other private equity players to drop out of the sale process, if known, would have sent a terrible signal to the market of the value of EMI.  A deliberate misstatement (or misstatements) by a person with knowledge of the bid process that another bidder remained in the process and was to submit a bid at a specific price could hardly be a more material misstatement.

11.     David Wormsley, the Citi executive working with both EMI and Terra Firma on the auction, made just those misstatements.  After learning that all of the other bidders had dropped out of the process, he became concerned that Terra Firma likewise might not submit a bid by the May 21, 2007 deadline.  That possibility—which would have resulted in a so-called "busted auction"—would have caused EMI's stock price to drop and caused significant reputational damage to EMI, Citi, and, in particular, Mr. Wormsley himself.  Because a busted

4

auction would have caused EMI's stock price to decline, it would likely have resulted in EMI being unable to meet its banking covenants, causing it to default under the debt that had recently been arranged by Citi, among others.

12.     To avoid the possibility of these misfortunes, Mr. Wormsley misrepresented that another, reputable, private equity firm, Cerberus Capital Management, was actively participating in the auction and would submit a bid on Monday, May 21, 2007 at 9am.  Citi misrepresented that, unless Terra Firma bid higher than that other private equity firm, EMI would be sold to that other bidder on Monday, May 21, 2007.

13.     In reliance on Citi's misrepresentations and having been told by Citi that its opportunity to acquire EMI would otherwise disappear, Terra Firma made a binding bid for EMI. Had Citi not misrepresented Cerberus's participation in the bidding process, among other matters, Terra Firma would not have bid for EMI on that Monday.

14.     But because Citi *did* misrepresent Cerberus's participation in the auction, Terra Firma submitted its formal bid at the bid price Mr. Wormsley had indicated was necessary for that bid to be successful, and acquired EMI in August 2007 for approximately £ 4 billion ("the Acquisition").  Terra Firma did so through non-party Maltby Acquisitions Limited ("MAL"), a special purpose acquisition vehicle that Terra Firma created specifically to execute the Acquisition.

15.     Citi did not stop with this auction fraud.  Both to avoid the unexpected economic consequences of its own decision to finance the EMI deal and to enhance the possibility of earning additional fees and profits in connection with its participation in a potential merger of EMI and Warner, Citi has gone on to intentionally interfere with Terra Firma's economic interests.  For more than two years, Terra Firma has not only operated EMI to generate

5

meaningful cost savings and improved earnings; it has made good faith efforts to restructure and

operate the EMI business in the face of the debt burden resulting from Citi's auction fraud. Citi

has rejected these efforts as part of a deliberate attempt to undermine EMI and, most recently

with an analyst report written by Citi's U.S. research arm, to attempt to soften the markets for

what Citi hoped would be the near-term outcome for EMI – Citi taking control of EMI by

pushing it into, or to the brink of, insolvency. In taking these actions, Citi has intentionally and

without legitimate justification undermined Terra Firma's investment in EMI.

16.     In fact, even with Citi's fraudulent and wrongful conduct, Terra Firma has been

able to right EMI's ship and dramatically improve its position. Under Terra Firma's leadership

EMI has more than tripled its EBITDA from 2008 to 2009, and has turned around its cash flow,

which has swung from a cash flow deficit of £ 144 million for the fiscal year in which Terra

Firma acquired EMI to a cash flow surplus of £ 190 million during the following fiscal year.

Indeed, Citi executives have admitted to Terra Firma on several occasions that EMI has

performed substantially better than Citi had expected EMI to perform when Citi made the

decision to extend the loan for the EMI acquisition.

17.     Citi's fraud and wrongdoing has caused damage to Terra Firma. Terra Firma

seeks its actual and consequential damages in an amount to be determined at trial, and

additionally seeks the imposition of punitive damages, plus allowable interest and costs.

### The Parties

18.     Plaintiff Terra Firma Investments (GP) 2 Limited (for and on behalf of the six

limited partnerships constituting the Terra Firma Capital Partners II Fund) is a company

organized under the laws of Guernsey with its principal place of business in St. Peter Port,

Guernsey, the Channel Islands.  Terra Firma Investments (GP) 2 Limited is the general partner of the six limited partnerships constituting the Terra Firma Capital Partners II Fund.

19.     Plaintiff Terra Firma Investments (GP) 3 Limited (for and on behalf of Terra Firma Capital Partners III, L.P.) is a company organized under the laws of Guernsey with its principal place of business in St. Peter Port, Guernsey, the Channel Islands.  Terra Firma Investments (GP) 3 Limited is the general partner of the Terra Firma Capital Partners III, Limited Partnership.

20.     Terra Firma is part of a leading international private equity group that has invested approximately $ 20 billion of equity capital in businesses around the world (including in the United States).  Terra Firma invests monies that it has raised from pension funds, insurance companies, sovereign wealth funds and endowments and other investors from around the world, with the greatest proportion of those funds coming from the United States.

21.     Terra Firma raises capital to be used in acquiring companies that it believes have significant unrealized value and that are in need of strategic, operational and/or management change.  Upon acquiring a company and adding it to its portfolio, Terra Firma uses its management expertise to unlock the company's value over the medium to long term, with the ultimate goal of selling the company for a profit.

22.     Defendant Citigroup Inc. is a Delaware corporation with its principal place of business in New York, New York.  Citigroup operates through a complex group of wholly-owned subsidiaries.

23.     Defendant Citibank, N.A. is a chartered national banking association with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of Citigroup, and serves as Citigroup's primary commercial lending arm.

7

24.     Defendant Citigroup Global Markets Limited is a limited liability company organized under the laws of the United Kingdom with its principal place of business in London, England.  It is a wholly-owned subsidiary of Citigroup.

25.     Defendant Citigroup Global Markets Inc. is a New York corporation with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of Citigroup Inc.

### Venue

26.     This Court has personal jurisdiction over each of the Defendants pursuant to CPLR § 302(a) because each Defendant transacts business within New York State that gives rise to the claims herein; each Defendant contracts to supply goods or services within New York State; and each Defendant committed a tortious act within this State that gives rise to the claims herein.

27.     This Court also has personal jurisdiction over defendants Citigroup, Inc., Citibank N.A., and Citigroup Global Markets, Inc. pursuant to CPLR § 301 because each of them is a resident of New York State.

28.     Venue is proper in New York County pursuant to CPLR § 503 because defendants Citigroup, Inc., Citibank N.A., and Citigroup Global Markets, Inc. reside in this County.

### I.   The Background Behind Citi's Motive, Culminating In Citi's Fraud

#### Citi's Relationship with Private Equity

29.     Citi is a global financial services conglomerate that has grown through the acquisition of a number of financial services companies through the years.  In 1998 Citicorp and Travelers Group undertook a $ 140 billion merger to create what was at that time the world's

8

largest financial services corporation and whose business included credit services, consumer finance, brokerage and insurance. In particular, Citi's size, relationships and coverage enabled Citi's investment banking group to become a global leader in financing and advising on transactions involving private equity firms.

30.     Private equity firms, including Terra Firma, typically finance a purchase of a company partially through an equity investment (*i.e.*, cash paid as part of the transaction) and partially through debt (*i.e.*, money borrowed from one or more banks or financial institutions). Between 2000 and 2007, Citi created a vigorous leading leveraged finance practice working with private equity firms (including Terra Firma) in buying, selling, and merging companies, financing those transactions and syndicating the resulting debt.

31.     Indeed, for many years, Citi developed and cultivated a relationship of trust and confidence with Terra Firma. Citi acted as a sell- and buy-side financial advisor to Terra Firma on a number of acquisitions and sales of companies and assets, as well as provided advice on financing and in fact often led the necessary financing to support those transactions. In addition, Citi led, managed and structured a number of major transactions including securitizations for Terra Firma. Citi advised Mr. Hands on the setting up of Terra Firma, and also advised Terra Firma and acted as placement agent in relation to the raising of certain Terra Firma funds.

32.     Throughout the course of Citi's relationship with Terra Firma, Citi, generally via communications between Mr. Wormsley and Mr. Hands, provided Terra Firma and its affiliates with information regarding potential acquisitions, and advice on such acquisitions.

33.     Through Citi's—and, in particular, Mr. Wormsley's—relationship with Mr. Hands Citi came to possess unique, specialized and confidential knowledge of Terra Firma.

34.     Thus, Citi frequently approached Terra Firma in order to introduce Terra Firma to potential acquisition targets and provide information designed to assist Terra Firma in undertaking those potential acquisitions.  Citi provided Terra Firma with this information with the expectation that Terra Firma would employ Citi's financing or investment banking services in connection with its pursuit of those acquisitions.

35.     This relationship was highly lucrative for Citi: excluding the EMI transaction, between 2000 and 2007 Citi received fees of more than £ 136 million from Terra Firma and its affiliates for providing advice and/or financing in connection with almost 20 acquisition, refinancing, and securitization transactions that totaled approximately $ 57 billion.

36.     Mr. Wormsley—then the head of UK Investment Banking for Citi and now Chairman of UK Banking at Citi—acted as the relationship manager for all issues arising between Citi and its affiliates on the one hand, and Terra Firma and its affiliates on the other.  As a result of the cultivation of this relationship and the fact that Mr. Wormsley expected that Terra Firma would continue to provide a steady flow of fee income for Citi, Terra Firma and its affiliates regarded Citi, and particularly Mr. Wormsley, as a valuable and reliable source of information.  Correspondingly, Citi, and in particular Mr. Wormsley, understood that Terra Firma would attach a significant degree of credence and importance to information provided by Citi to Terra Firma regarding a potential acquisition, and would use that information in deciding whether and how to proceed with an acquisition.

37.     As a result of this longstanding relationship, Terra Firma and its managing agents, including Mr. Hands, came to repose trust and confidence in the accuracy of information provided to Terra Firma and its affiliates by Citi, including through Mr. Wormsley.

### *EMI's Deteriorating Financial Condition*

38.     Along with Universal Music Group, Sony Music and Warner Music, EMI is one of the four so-called "major" music companies.

39.     The business of EMI was, and is, divided into two divisions, Music Publishing and Recorded Music.  Music Publishing, headquartered in New York City, generates revenue from the fees it charges people to use the music compositions that it owns.  Recorded Music, headquartered in London, records, promotes and sells music, including signing artists, releasing albums, and generating revenue from the fees it charges for people to use the music recordings that it owns or controls.

40.     As of May 2007, EMI was a publicly held company.  EMI and the various labels under the EMI umbrella, including Capitol, Capitol Nashville and Blue Note, have represented or released music by some of the most famous American musicians of the past and present, including the Beach Boys, Miles Davis, Ice Cube, Norah Jones, Lenny Kravitz, Thelonious Monk, Katy Perry, Frank Sinatra, and Snoop Dogg.  The EMI Music Publishing roster includes Paula Abdul, The B-52s, Beyoncé, Tracy Chapman, The Fray, Jay-Z, Alicia Keys, Marilyn Manson, John Mellencamp, Train, Luther Vandross, and Kanye West.

41.     The recorded music industry has been in decline globally since 1995, which was the peak of the shift by consumers to compact discs.  In 1998, the emergence of free "peer to peer" file transfer and the proliferation of piracy accelerated this deterioration.  While the introduction of iTunes in 2005 and the growth in digital distribution more generally has provided some additional revenue for the industry, that revenue has been insufficient to prevent the continuing decline in the market for the sales of music stored on physical media.

11

42.     Accordingly, EMI, like all of the other "majors", had for a number of years faced a declining market, notwithstanding the opportunities offered by digital technology.

43.     EMI's position within this market had also diminished. In 2000 EMI was ranked 3rd in the world with a market share of 14%; by 2007 EMI was ranked 4th with a market share of less than 10%. Overall its revenues declined by 26% from 2000 to 2007.

44.     The continuing decline in EMI's fortunes had two major impacts on the business. First, EMI was trapped in a cycle of continuous cost-cutting as the only means by which it could stabilize profits given its continuously declining revenue. However these efforts involved restructuring initiatives that required capital expenditures in the short-run; and in order to undertake them EMI's assumed accumulating debt. In 1999 EMI's total borrowings were £ 877.7 million. Over the next eight years EMI's total borrowings increased to £ 1,667.5 million immediately prior to the Acquisition in 2007.

45.     Second, since at least 1999, experts, bankers and certain insiders at EMI and Warner have believed that EMI should merge with another company in the music industry, most likely Warner, because of the potential synergies and economies of scale between the two companies. Accordingly, between 2000 and 2007, EMI and Warner repeatedly pursued a merger—at times making offers to buy one another and negotiating the potential terms of a merger.

46.     However, the EMI-Warner merger never took place in part due to uncertainty regarding whether the merger would be approved by the relevant regulatory authorities and in part because the two companies were unable to agree on which management team would lead the merged entity.

12

47.     Because of EMI's growing debt (the result of its restructuring initiatives and declining revenues) and its interest in merging with Warner, EMI began to cultivate strong relationships with financial institutions, particularly those that had both the balance sheet to support the necessary financings and the expertise and relationships to enable EMI to pursue its strategic goals.  Citi was ideally placed to play this role.

### *Background Leading to Citi's Role as Advisor and Lender to EMI*

48.     Citi has had a long standing relationship with EMI.  Between 2000 and 2007, Citi provided EMI with a growing amount of investment banking advisory services, commercial lending assistance, brokerage services, as well as debt arrangement and syndication services—and earned extensive fees.

49.     In light of its increasingly close relationship with EMI, Citi viewed the prospect of an EMI-Warner merger as an opportunity to generate substantial merger and acquisition fees, financing arrangement fees, ongoing income from the loans issued in connection with that merger, and fees generated in connection with the syndication of that debt.

50.     Beginning in the late summer of 1999, Citi acted as banker for both Warner (then part of Time Warner Inc.) and EMI in a proposed merger, and was to have been one of six banks providing $ 4.5 billion to finance the deal.  EMI and Warner agreed to the terms of a merger and sought approval from the antitrust authorities in the United States and European Union.  In October 2000, when it became clear that the European Union would not approve the combination in light of the AOL-Time Warner merger in process at the time, EMI and Warner terminated the transaction.  Thereafter, Citi, as one of six banks, continued to provide lending services to EMI.

51.     In early 2002, EMI came under increasing pressure from its lending banks (including Citi) to restructure its loans.  EMI's six lead lending banks (including Citi) developed a new capital structure under which EMI would raise £ 1.3 billion in long term debt, £ 800

13

million of which would be syndicated.  Citi, as joint book-runner (with JPMorgan and Barclays),
would sell the remaining £ 500 million on the capital debt markets.

    52.    In early 2003, Moody's downgraded EMI's credit rating and during the following
summer EMI's financial performance continued to suffer.  The downgrade triggered higher
interest rates under a portion of EMI's capital market debt.  EMI's poor financial performance
led to its concern over whether it would meet its covenants under certain parts of the capital
market debt.  The banks involved in the £ 800 million syndicated loan, including Citi, were also
uncomfortable with their risk exposure in these circumstances (the banks were reluctant to have
EMI debt at the lower credit rating on their balance sheet).  The lead lending banks, including
Citi, suggested unwinding the syndicated loan and replacing it, and certain portions of the capital
market debt, with a convertible bond, a high-yield bond and a £ 250 million bank facility.  Citi
received the book-runner mandate for the high-yield bonds.  On the second day of the marketing
of the bonds, Richard Parsons, the then-Chairman of Time Warner and a member of Citi's Board
of Directors (and now Chairman of Citi), contacted Eric Nicoli, who at the time was the
Chairman of EMI, to invite him to apply to buy a division of Warner.  EMI's merger and
acquisition advisors at that time (UBS and Goldman Sachs) discouraged EMI from proceeding
with the placement of the bonds, and instead encouraged EMI to focus on the Warner merger.
Citi, on the other hand, supported EMI with its pursuit of the bond placements, and further
worked with EMI to develop a financing package for the Warner merger.

    53.    Despite Citi's efforts, an EMI-Warner merger did not come to pass, and AOL
Time Warner sold the company for approximately $ 2.6 billion to a group of private equity firms
led by Edgar Bronfman Jr.

54.     Having delivered on the bond placement and having developed a good finance package for the attempted Warner deal, EMI invited Citi to replace Goldman Sachs as EMI's merger and acquisition ("M&A") advisor.

### *Citi Becomes EMI's Chief Outside Advisor and Lender*

55.     Thus, by the end of 2003, Citi had emerged as the lead bank for EMI, acting as both merger and acquisition advisor and lead lending bank.  Citi continued in these roles through 2004 and 2005.

56.     In 2004, Citi, along with the other lending banks, agreed to provide EMI with another £100 million in addition to EMI's then-existing £ 250 million debt facilities.

57.     In July 2005 EMI began to experience capital erosion due to poor trading performance.  After it issued a profit warning, it was forced to refinance its £ 350m worth of bank debt in a "club deal" brokered by Citi which resulted in nine banks providing a new £ 450m revolving facility.

58.     In the summer of 2006, EMI and Warner again pursued a potential merger.  Citi, along with Deutsche Bank, was EMI's M&A advisor at this time.  EMI and Warner each made two offers to purchase the other, culminating in an EMI bid for Warner on May 1, 2006 for $ 31.00 per share, and Warner's subsequent bid, at £ 3.20 per share, for EMI.  The deal again failed to transpire, this time in part because the parties feared that such a deal would either not be approved by antitrust regulators or would be prolonged in closing due to regulatory uncertainties.

### *Fall 2006:  Citi Turns to a Private Equity Sale of EMI*

59.     By the fall of 2006, EMI's finances had begun to deteriorate even more rapidly than in the previous years of poor trading as a result of upheaval in the marketplace for mechanical recorded music; meanwhile the EMI-Warner merger was no longer a solution to

15

EMI's financial problems in the near term because such a merger was not expected to be approved immediately due to regulatory uncertainty. In the wake of this, Citi—seeking to capitalize on the relationships it had established with private equity firms and hoping to generate fees and interest—encouraged EMI to take a new and different path. It encouraged it to sell itself to a private equity fund.

60. Mr. Nicoli, in particular, was receptive to this argument. As he wrote internally at EMI, Mr. Nicoli believed that a leveraged buy-out by private equity was the only "strategic option apart from an uncertain deal with WMG [*i.e.*, Warner]" remaining available to EMI.

61. On November 28, 2006, Permira (another private equity group) submitted an unsolicited indicative bid to acquire EMI for £ 3.20 per share, subject to conducting due diligence on the potential transaction.

62. Although Citi had been functioning as EMI's investment advisor, EMI's Board of Directors concluded that Citi could not serve as its independent advisor for the sale because, among other reasons, Citi maintained close relationships with private equity firms and was particularly close to EMI's management, in particular, Mr. Nicoli. Accordingly, the Board appointed its own advisor for the potential sale, Greenhill & Co International LLP ("Greenhill").

63. Nevertheless, Citi, and in particular Mr. Wormsley through information he continually received from Mr. Nicoli, maintained a major role in the subsequent auction process. It worked closely with EMI to recruit potential bidders and it communicated with those bidders about the auction process. And it also provided EMI and its Board with advice in response to takeover initiatives and indications of interest from private equity groups.

64. In fact, through Mr. Wormsley, Citi was one of three outside advisors (along with Greenhill and, also, Deutsche Bank) who managed the process by which EMI sought to sell itself

16

to private equity groups. Given Mr. Wormsley's close relationships with private equity firms, he played a central role in this process. Mr. Wormsely, as EMI's sell-side financial adviser and corporate broker performed the following acts, among others: (i) he attended meetings of EMI's Board at which bids for EMI were discussed; (ii) he maintained frequent contact with various members of EMI's Board of Directors regarding possible bids, including in particular with Mr. Nicoli; (iii) he received full information from EMI regarding actual bids and EMI's financial situation; and (iv) he advised EMI's Board on what actions it should take. Mr. Wormsley played these roles at least until May 21, 2007.

65.     The day after Permira submitted its bid in 2006, Citi representatives, including Mr. Wormsley, attended a meeting of EMI's Board of Directors which had been convened to discuss the bid. During the meeting, Citi provided strategic advice to EMI's Board, including advising on possible points for negotiation. Despite the momentum within EMI toward selling to private equity, the Board decided not to recommend that EMI's shareholders accept Permira's bid because the Board believed that Permira would increase its bid if the initial bid was rejected.

66.     On November 30, 2006, Mr. Wormsley informed Permira that EMI would not accept its indicative bid. Permira subsequently revised and increased its indicative bid to £ 3.25 per share. Based on the revised offer, EMI provided the due diligence that Permira demanded in connection with confirming its intent to purchase EMI.

67.     Also on November 30, 2006, Mr. Wormsley contacted Guy Hands of Terra Firma to inquire as to whether Terra Firma was interested in making an offer to purchase EMI. At Citi's suggestion, on or about December 1, 2006, Mr. Hands arranged for a Terra Firma "deal team" to analyze EMI's business, and to evaluate potential partners who could provide Terra Firma with debt financing for a potential acquisition.

17

68.    In its preliminary analysis of EMI, the Terra Firma deal team concluded that EMI constituted an attractive takeover target. Based on this, Mr. Hands telephoned Mr. Wormsley on December 13, 2006 to inform him that Terra Firma was interested in receiving due diligence information about EMI. Mr. Wormsley reported this conversation and request to Mr. Nicoli.

69.    The next day, on December 14, 2006, Permira—having now had the chance to conduct due diligence—notified EMI that it was no longer interested in acquiring the company. This decision surprised and disappointed certain EMI management and members of the Board because they believed that the transaction was likely to occur and would be beneficial to EMI's shareholders and central to EMI's long-term survival. That the rejection came from a private equity group made Permira's withdrawal, in light of EMI's developing "go private" strategy to help the company, all the more difficult.

70.    EMI then informed Terra Firma that EMI was not being pursued by any bidder that had made an indicative offer, and, therefore, was not obligated under the takeover rules to provide further information to Terra Firma. EMI was unwilling to provide Terra Firma with the same information provided to Permira prior to its withdrawal, on information and belief because there was no other interested buyer, and therefore no possibility of developing the competitive tension necessary for an auction. ·

### _EMI Options Begin to Dwindle In Light of Its Continued Financial Decline_

71.    During December 2006, EMI's financial options narrowed yet further. Amidst this, EMI executives grew concerned that the company would breach its debt covenants, and, according to a January 2007 presentation to the EMI Board, that it would remain "simply too difficult for [private equity] to get comfortable with the growth and leverage assumptions necessary to meet the Board' s value threshold in the current market environment[.]"

18

72.     Led by Mr. Nicoli, EMI therefore began to consider more radical restructuring efforts—the type of restructuring that a private equity firm would undertake, even though EMI was still a publicly held entity.  The initiative was dubbed "Project PEPE", the latter word an acronym for "Private Equity in the Public Environment."  Project PEPE envisioned substantially restructuring EMI, implementing a cost savings plan, and, crucially, recapitalizing EMI by borrowing against the future revenues of the Music Publishing division.  In essence, Project PEPE was a plan to increase EMI's debt in order to fund a major restructuring—just as a private equity firm could be expected to perform.

73.     At the same time and as a complement to EMI's internal efforts, EMI assembled its creditor banks, including Citi, in early January 2007 to discuss a refinancing of its existing debt facility.

74.     Events, however, overtook EMI's efforts on Project PEPE and the newly-discussed refinancing.  In January 2007, EMI issued a profit warning that annual revenues for the fiscal year ending March 31, 2007, would be down between 6% and 10%.  Project PEPE was de-prioritized and refinancing talks took on immediate urgency within EMI.

75.     In response to the failure to meet forecasts, the Board terminated Alain Levy as the head of EMI Music, and installed John Gildersleeve as non-executive Chairman.  Mr. Nicoli took on the role of CEO of EMI Music, which was the division where most of EMI's financial problems were.

76.     The decline in revenue caused EMI executives to "worry ... [about] the March [31,] 2007 interest cover covenant" in EMI's outstanding debt.

77.     Thus, in the wake of the profit warning, EMI immediately resumed negotiating with its banks, including Citi, over the terms of refinancing its debt.

19

78.     But on February 14, 2007, EMI was forced to announce a second—and, equally importantly, an unexpected—profit warning, based on the conclusion that revenues for the twelve months ending March 31, 2007 would decline by *15%* (not the previously announced 6% to 10%).

79.     This additional, unexpected, downward revision of EMI's financial forecast in February reverberated with EMI's banks, including Citi.  Refinancing discussions became all the more urgent.

80.     In connection with those discussions, in mid-February 2007, Citi requested, and received, detailed information and projections from EMI regarding future earnings, cash flow and other relevant financial information for the fiscal years ending March 2007 through 2011, or five years of projections.  The detailed financial projections included such things as revenue, EBITDA, cash flows from operations, including capital expenditures and changes in networking capital, tax, overheads and expected growth rates.  At the request of the banks, including Citi, in early March 2007 EMI provided additional information as part of the banks' due diligence in connection with refinancing EMI's £ 450 million facility.  In addition, this second production of information by EMI included an updated version of the projections provided in February.

81.     With two weeks left in its fiscal year ending March 31, 2007, Mr. Nicoli also expressed internal concern over the approaching March 2007 covenant test.  Stressing the importance of finalizing the new credit facility, he stated that:

> "[f]urther slippage from the most recent inputs from your CFO will
> result in catastrophe.  ...  A third profits warning in 3 weeks time
> would be terminal and hand our business to Warners [sic] on a
> plate at a low price.  That would be a complete management
> failure.  And, believe it or not, there is a worse possible outcome.
> If we breach our latest covenants, we will not get a bank deal and
> we'll hand the business to the banks to dispose of as they see fit.
> We will, in effect, be bankrupt.  ...  [The CFO]'s bank negotiations

20

> are by far the toughest in our company's history and they're not
> going well."

82.     During EMI's negotiations with the banks (which included Citi) regarding terms

for the new credit facility, EMI expressed its concerns over the financial covenant ratios

proposed by the banks in their original term sheet.  EMI ultimately concluded—and convinced

the banks, including Citi, to accept—a higher (*i.e.* easier to satisfy) covenant ratio, and

successfully negotiated this less restrictive leverage ratio.  Furthermore, EMI also obtained

agreement from the banks, including Citi, for less restrictive financial covenants related to

leverage and interest cover ratios required at later covenant test periods as well.

83.     On March 29, 2007, EMI completed its refinancing efforts, resulting in a £ 400

million term loan and £ 300 million revolving facility.

84.     Almost immediately following the refinancing, EMI grew concerned that it might

*not satisfy the loans'* conditions regarding EMI's financial results on September 30, 2007.

85.     EMI began anew to consider its options, including again negotiating with its

banks, such as Citi, regarding alternative means of satisfying its debt covenants.  EMI had been

involved in litigation regarding the digital music sharing system Napster, which, according to

EMI and other record companies, had breached EMI's and the other record companies'

copyrights.  Bertelsmann had purchased Napster and was in the process of executing a settlement

with EMI and the other record companies and making a substantial settlement payment.  This

settlement was reached prior to the end of EMI's year ended March 31, 2007.

86.     The Bertelsmann settlement income would have been treated as an exceptional

item in EMI's financial statements and excluded from EBITDA when calculating the leverage

ratio in accordance with the new credit agreement.  However, shortly after the refinancing, EMI

requested, and its refinancing banks (including Citi) agreed, to allow EMI to include the

21

Bertelsmann settlement income in EBITDA for purposes of calculating its financial covenants for the September 2007 covenant test.

87.     Although the September 2007 covenant was made irrelevant by the Acquisition, if EMI had been forced to satisfy that covenant, the exceptional income from the Bertelsmann settlement would have made the difference between passing and failing that covenant.

88.     During the process of negotiating and implementing the refinancing, given two profit warnings in two months, EMI's banks (including Citi) had expressed strong reservations about refinancing EMI's debt unless EMI agreed to provide additional protection to the banks in the form of the securitization of the revenue from EMI's Music Publishing division.

89.     Securitizing intellectual property was a relatively new phenomenon at the time. It had been tried in 1997 for the first time, when investment banker David Pullman issued so-called "Bowie Bonds," which were securities issued on the strength of the future royalty payments of certain of David Bowie's music. EMI began work on a vastly more ambitious project: securitizing a majority of the copyrights owned by its New York-based business, Music Publishing, perhaps the most valuable catalog of music compositions in the world. EMI worked with its bankers to try to develop plans to securitize these rights. The securitization was central to EMI's strategic plans in part because its banks (including Citi) exerted enormous pressure to monetize those assets to secure the refinancing. The securitization would provide debt to EMI at lower rates, and the banks (including Citi) would eliminate their exposure to EMI's debt because the securitization was expected to raise sufficient cash to pay down the newly refinanced facilities.

90.     Thus, immediately following the new financing, EMI began work on the securitization process. After sending requests for proposals to several banks, Citi believed it was

22

likely that EMI would select Citi for the securitization, especially in light of the amount of investment banking and commercial lending assistance Citi had provided to EMI. As well as offering Citi and the other lenders a clear exit from the newly refinanced debt package (whose covenants already looked under pressure), the securitization engagement would have generated significant fees and, because it would be much larger and more complex than the Bowie securitization, would carry a great deal of prestige and reputational benefit for the bank selected But the transaction was likely to be complex and time-consuming: the earliest it could have been completed was the end of 2007 and the arcane nature of the underlying asset class (copyrights) carried with it significant execution risk.

91.     Contrary to Citi's expectation—and to its disappointment—EMI chose RBS and Deutsche Bank, rather than Citi, to handle the securitization. Citi would therefore not receive the voluminous fees—nor the reputational boost from executing a far more complex project than the original Bowie Bonds—that it had hoped to obtain.

### *Spring 2007: EMI Continues To Be Marketed to Potential Purchasers*

92.     In the midst of all of this, on February 20, 2007, Warner had announced, and EMI confirmed, that on January 24, 2007 Warner had again made an offer to purchase EMI.

93.     On March 2, 2007, EMI announced both that Warner had offered to purchase EMI for £ 2.60 per share—a much lower price than Warner had previously offered—and that the EMI Board had rejected Warner's offer. EMI executives were concerned that the uncertainty of regulatory approval was too high and, even if approved, the price was too low (effectively £ 2.00 per share after discounting for the uncertainty of regulatory approval and the time value of money based on the delay in obtaining that approval).

23

94.     Instead, Mr. Nicoli was very much in favor of a private equity solution. Although he had temporarily averted a financial crisis with EMI's new financing in place and the process of securitizing EMI's Music Publishing revenue, he and other EMI management and Board members were aware that they needed a more permanent solution to avert the continuing deterioration of the business. Revenues continued to decline in April compared to the same period in the prior year and it was unclear whether the business would be able to satisfy even the new less demanding covenants in the refinanced facility. Meanwhile, work on the securitization had begun but that work would take a number of months to complete. In any event, securitization of the Music Publishing business would not in itself fix EMI's operational problems or make EMI less vulnerable to an acquisition by Warner.

95.     Accordingly, EMI continued to market itself to potential private equity purchasers, facilitated by Citi and Mr. Wormsley on Citi's behalf.

96.     Citi was incentivized by the financial advisory fees it stood to earn in the event of a successful sale of EMI, and, in particular, the additional potential benefits of a sale to a private equity firm.

97.     Moreover, a private equity transaction offered Citi a second bite at the securitization apple. Citi could use the leverage of providing acquisition financing for the winning EMI bidder (which is exactly what transpired as a result of Terra Firma's acquisition) to obtain the much prized mandate. Indeed, this was part of Citi's calculus even before EMI awarded the initial securitization mandate, Citi made it clear in an email to EMI on 4 April 2007 that, should Citi not be appointed as securitization arranger, it would request that the securitization process not be advanced too far in light of the likelihood of it providing staple financing to a private equity bidder.

24

98.    Finally Citi was motivated by the prospect of an ultimate sale of EMI to Warner following a purchase by a private equity concern. It would have been clear to Citi that the issues about who would manage an EMI/Warner entity—issues that had previously hindered merger efforts—would be greatly diminished if EMI were owned by a private equity firm. And Citi stood to earn substantial additional revenue as adviser and possibly a financier to the backers of EMI in a combination with Warner, with the possibility of further work to be obtained from the merged entity.

## II. The Auction

99.    In April 2007, a number of private equity groups submitted indicative bids for EMI, including:

      a.  an indicative bid of £ 2.62 per share, submitted by Cerberus Capital LLC ("Cerberus") on April 16, 2007;

      b.  an indicative bid of £ 2.50-£ 2.60 per share, submitted by Fortress Investment Group LLC ("Fortress") on April 17, 2007; and

      c.  an indicative bid of £ 2.50-£ 2.60 per share, submitted by One Equity Partners LLC ("One Equity") on April 23, 2007.

100.    The EMI Board discussed the Cerberus and Fortress offers on April 20, 2007, and concluded at that meeting that:

      a.  due to EMI's increasing financial difficulties, EMI would seriously consider a bid of £ 2.60 per share or higher, notwithstanding its rejection of Permira's higher offer in late 2006;

      b.  only Warner, with its potential for significant synergies, was likely to be able to pay a materially higher price than £ 2.60 per share;

25

c. the Board would invite Fortress and Cerberus (One Equity did not submit its bid until several days after the Board meeting) to reconfirm their indicative bids based on confirmatory due diligence; and

d. EMI's CEO Mr. Nicoli should contact other parties that had previously indicated interest.

101.    Upon information and belief, Mr. Nicoli informed Mr. Wormsley of the matters discussed at the meeting of EMI's Board of Directors in order to inquire whether Terra Firma remained interested in acquiring EMI. Upon information and belief, Mr. Nicoli kept Mr. Wormsley apprised of the amounts of, and provided detailed status reports on, the indications of interest received by EMI, the auction process, and of the identity of the bidders.

### *Terra Firma Joins the Process Late and Evaluates a Possible Bid for EMI*

102.    During the week of April 23, 2007, Mr. Wormsley spoke with Mr. Hands about the possibility of Terra Firma making an offer to purchase EMI. Terra Firma had continued to consider acquiring EMI since its involvement in the Permira process in December 2006. Although Terra Firma had been refused access to the information provided to Permira, Terra Firma had continued to analyze the sector and conduct commercial due diligence.

103.    During their conversation, Mr. Wormsley emphasized to Mr. Hands that he had a good relationship with Mr. Nicoli, and that Mr. Wormsley thought highly of Mr. Nicoli and his plans for EMI and EMI's future prospects. Mr. Wormsley also emphasized his confidence in Mr. Nicoli's integrity and his belief that EMI would be able to provide Terra Firma with the financial information that Terra Firma would need in order to make a bid for EMI.

104.    Mr. Hands responded that if Terra Firma were to enter the process, it would be starting much later than the other potential bidders, which would hinder Terra Firma's ability to

26

obtain financing and would require expedited due diligence, so that Terra Firma would be forced to rely heavily on the integrity of the numbers presented by EMI's management. Mr. Hands asked Mr. Wormsley for the opportunity to speak to Mr. Nicoli directly.

105.   On April 30, 2007, EMI gave Cerberus, Fortress and One Equity access to its electronic "data room" of due diligence materials for use by potential bidders. EMI also gave Citi access to the data-room. Terra Firma was provided no such access at that point.

106.   On May 1, 2007, EMI (through Greenhill) informed Cerberus, Fortress, and One Equity that the target date for bids was May 23, 2007, but that the Board would also consider offers made before that date. Terra Firma learned of EMI's timetable in the following few days.

107.   On or about May 4, 2007, EMI released to Cerberus, Fortress and One Equity a vendor due-diligence report ("the Deloitte Report") prepared for potential bidders by Deloitte & Touche LLP ("Deloitte").

108.   Also on May 4, 2007, EMI publicly announced that it had received a number of preliminary indications of interest to acquire the company.

109.   On the morning of Sunday, May 6, 2007, some three weeks after the other bidders had submitted their indicative bids, Mr. Hands met with Mr. Nicoli for approximately two hours to discuss Terra Firma's potential acquisition of EMI. Mr. Hands explained that due to the short time available, Terra Firma would need assistance in obtaining access to due diligence, would require outside financing to fund any acquisition of EMI, and would need to know what the target price was. Mr. Nicoli told Mr. Hands that he should discuss financing and pricing issues with Mr. Wormsley of Citi, and represented that EMI would be helpful in providing due diligence to Terra Firma.

27

110.    Shortly after this meeting, during the afternoon of May 6, 2007, Mr. Hands and Mr. Wormsley spoke by telephone. Mr. Hands explained that Terra Firma would put together a team to analyze a possible purchase of EMI, but that Terra Firma would need help from Citi to finance the transaction. Mr. Wormsley responded that Citi knew EMI's business well and "knew what they were doing." Mr. Wormsley identified the other bidders as being Cerberus, Fortress and One Equity, and advised Terra Firma to submit an indicative bid of £ 2.65 per share in order to enter the process and obtain access to due diligence materials.

111.    Thus, by no later than the afternoon of May 6, 2007, Citi and Mr. Wormsley were aware that Terra Firma had an interest in bidding for EMI, and that Terra Firma could only do so in the time available with Citi's assistance.

112.    On May 8, 2007, Terra Firma sent a letter to EMI identifying an indicative bid of £ 2.65 per share. At 11:28 PM that evening, Mr. Wormsley sent an e-mail message to Mr. Hands stating:

> "Spoke to Eric [Nicoli], we should have a word.
>
> I have a debt team clear to talk to you. Not quite there on [one aspect of the potential financing] but still working on it. Which FMD [Financial Managing Director] is leading the charge so I can put the teams in charge."

113.    Citi, through Mr. Wormsley, was taking an active role in arranging *financing* for a bid by Terra Firma (in addition to his role as sell-side merger and acquisition advisor to EMI).

114.    EMI was apparently pleased with the work Mr. Wormsley was doing as sell-side M&A advisor. On receipt of Terra Firma's indicative bid a member of the EMI Board emailed Mr. Wormsley forwarding the indicative offer and stating: "As promised." Mr Wormsley responded stating:

> "As I explained to Eric [Nicoli], I have negotiated against Guy [Hands], and Riaz Punja his point man, on literally dozens of occasions. He is very quirky and, whilst I can not

make the case for any of the US bidders, I am absolutely certain that I can deliver very serious added value in any discussions with Guy. Would be delighted to chat on the subject"

115.    On or about May 10, 2007, EMI granted Terra Firma access to the data room and the Deloitte Report. Terra Firma began due diligence on the materials in the data room and in the Deloitte Report, and engaged KPMG, LEK Consulting, McKinsey & Co. and Weil, Gotshal and Manges ("Weil") for this purpose in addition to performing its own internal due diligence.

116.    Although the March 2007 debt facilities were placed in the data room, the covenant ratios were redacted so that they could not be considered by bidders. In addition, no forecasts were provided to the bidders even though, as noted above, Citi had received the 5 year management forecasts during the March 2007 refinancing due diligence. These facts highlighted the unusual circumstance that, because of its multiple roles, the commercial bank providing the financing for Terra Firma's bid for EMI—Citi—knew more about management's views of EMI's prospects than the bidder it was financing.

### Citi Puts Together a "Debt Team" to Provide Terra Firma with Financing for a Possible EMI Bid

117.    For the "debt team" working with Terra Firma, Citi chose some of the Citi executives who had previously worked on Citi's renegotiation of EMI's credit facilities, through which those executives had access to confidential EMI financial information. EMI initially balked at this prospect. On May 13, 2007, in an e-mail message to Matthew Smith of Citi, copied to senior EMI personnel, a senior EMI executive asked: "How can Paul Simpkin and Ricardo Coats be on the buyside financing for Terra Firma – these are the key guys who work with us on bank deal, staple, and everything else??????"

29

118.   Nevertheless, following discussions with Mr. Wormsley, EMI, eager to obtain a competitive bid from Terra Firma and having realized that without Citi's assistance Terra Firma would not bid at all, agreed to accept Citi's involvement in Terra Firma's financing.

119.   On May 15, 2007, Citi's credit committee met to consider giving preliminary approval to the financing for Terra Firma's proposed bid.  In an e-mail message sent that evening, Mr. Coats of Citi informed Terra Firma that Citi's credit committee had requested further information, but Mr. Coats offered to show Terra Firma the proposed, but as yet unapproved, debt structures.

120.   On or about May 16, 2007, Terra Firma established the acquisition structure for the bid by which MAL was proposed to be the acquisition vehicle on behalf of Terra Firma. (MAL's immediate parent, Maltby Investments Limited ("MIL") and MIL's immediate parent, Maltby Holdings Limited, were also part of the acquisition structure and had all been incorporated on April 25, 2007 as shelf companies.)

121.   Citi's credit committee reconvened on May 17, 2007 to consider the financing for Terra Firma's proposed bid, during which Mr. Wormsley telephoned Mr. Hands who handed the call to Tim Pryce, who during all relevant periods was Terra Firma's General Counsel, to inform them of progress.  Mr. Wormsley explained that:

     a.   he had participated in the meeting by telephone,

     b.   it was likely that Citi's credit committee would approve the underwriting of the debt package; and

     c.   approval would be contingent on Terra Firma promptly making a binding offer— a point that Mr. Wormsley reiterated several times during the call.

30

122.    Just as important was the involvement of at least one very senior Citi executive based in New York, who informed Mr. Hands in writing on May 17, 2007 that he was "personally involved" in ensuring that Citi finance Terra Firma's bid.

123.    During the morning of Friday, May 18, 2007, Mr. Wormsley sent an e-mail message to Mr. Hands to ask "how is it going." Mr. Hands responded: "thank you for your help. We are getting there but need to sort out covenants with your lending team."

124.    On or about the same day, Citi's credit committee granted approval to Citi to provide the financing sought by Terra Firma up to a maximum of approximately £ 3 billion. On information and belief, Mr. Wormsley was in close contact with members of Citi's debt team or credit committee, and had knowledge of the financial package being offered to Terra Firma by Citi. As a result of that knowledge and in combination with his longstanding familiarity with Terra Firma, Mr. Wormsley could infer the maximum amount that Terra Firma could bid for EMI.

125.    No other banks could commit by Monday morning to underwriting all of the financing necessary for Terra Firma's bid. Citi's approval process for the financing took less time than other banks would have needed because Citi was able to leverage its previous knowledge and experience with EMI, including its access to due diligence information that was not provided to Terra Firma. Citi knew this and was eager to be the sole underwriter in order to maximize its fees and ability to control the syndication process.

### *The Auction Fraud*

126.    Approximately one hour after Mr. Hands sent the e-mail message to Mr. Wormsley regarding Terra Firma's need to "sort out covenants with your lending team," the EMI Board decided to accelerate the bidding process—requiring that all firm offers be submitted by 9:00

31

AM on Monday, May 21, 2007 for consideration by the Board of Directors when it convened at 1:00 PM that day. The accelerated deadline was formally communicated to Terra Firma by Greenhill.

127. Between May 18 and May 21, 2007, Mr. Hands was in frequent contact with Mr. Wormsley regarding Terra Firma's bid for EMI and the terms of the financing being offered by Citi.

128. During one such conversation on the evening of May 18, 2007, Mr. Wormsley told Mr. Hands that EMI was accelerating the bidding deadline and that another bidder supported EMI's decision to do so. In the course of this and subsequent conversations, Mr. Wormsley further represented that:

  a. EMI had Cerberus bidding at £ 2.62, which Terra Firma would have to exceed if it was to win the auction;

  b. If Terra Firma did not submit its bid by 9:00 AM on Monday, May 21, 2007, the EMI board would recommend accepting the Cerberus bid; and

  c. Citi would make sure that Terra Firma had the financing in place to make a bid.

129. Mr. Wormsley repeated these points several times during the course of several conversations with Mr. Hands over the weekend through May 21, 2007, including one at approximately midnight at the start of Monday, May 21, 2007. During that Sunday night/Monday morning telephone call, Mr. Wormsley, on behalf of Citi and with the knowledge of EMI's CEO, Mr. Nicoli, who on information and belief was aware that EMI could not withstand a failed bid process and that his reputation would be critically injured by a failed bid, repeated that there was another bidder in the auction for EMI; that the other bidder would bid on Monday morning at £ 2.62 per share; that a bid of £ 2.65 per share by Terra Firma would ensure that EMI's Board

recommended Terra Firma's offer to EMI's shareholders; and that a failure by Terra Firma to provide a bid by Monday, May 21, 2007 at 9:00 AM at or above £ 2.62 would ensure that Terra Firma would lose the EMI auction to the other bidder.

130.   Mr. Wormsley intended for Mr. Hands to believe all of the statements set forth above. However, Mr. Wormsley was aware when making these statements that:

  a.   Accelerating the deadline for Terra Firma's bid to 9:00 AM on Monday, May 21, 2007—the next business day—would mean that Terra Firma would be compelled to select Citi for the financing as no other bank could leverage off its pre-existing knowledge of EMI to provide a binding financing commitment by the Monday deadline;

  b.   Citi would be able to provide funding to Terra Firma of approximately £ 3 billion;

  c.   One Equity and Fortress had dropped out;

  d.   Cerberus had begun to show, as early as May 19, substantially diminished interest and, as of no later than 3:50 p.m. on May 20, informed EMI that it would not be bidding in the auction; and

  e.   If Terra Firma failed to get its bid in by 9:00 AM on Monday, May 21, 2007, there was no other bidder and it would have been a "busted auction."

131.   Through this conduct, Citi intended to induce Terra Firma to submit a binding bid for EMI at a price in excess of £ 2.62 per share, with the consequence that the bid would succeed and that Terra Firma would have no alternative but to rely on Citi's financing for the Acquisition based on a commitment letter and long form term sheet—because there was insufficient time to agree to detailed documentation.

33

132.    In reliance upon Mr. Wormsley's statements as set forth above, and as intended by Mr. Wormsley, Mr. Hands informed the Deal Team that there was a competing bid at £ 2.62, and that Terra Firma needed to submit a higher bid by Monday morning if it was to win the auction.

133.    Terra Firma reasonably and foreseeably relied on Mr. Wormsley's representations regarding the existence of Cerberus' competing bid of £ 2.62 per share.

134.    On May 21, 2007, Plaintiffs, the Terra Firma general partners, agreed to submit a bid, at £ 2.65 per share, designed to exceed the supposed £ 2.62 bid by Cerberus.

135.    On May 21, 2007, Citi entered into a "Term Sheet" and Commitment Letter recording the terms under which it committed to provide a term loan of not less than £ 2.5 billion (for the acquisition of the business) plus revolving credit of £ 350 million (for the operation of the business) and an acquisition facility of £ 300 million (for making further M&A transactions in the course of EMI's business).

136.    On May 21, 2007, Terra Firma submitted a binding offer ("the Offer") to purch-ase all of the outstanding common stock of EMI for £ 2.65 per share.  Terra Firma submitted the Offer in reliance on the truth of Mr. Wormsley's representation that Cerberus was submitting a firm bid of £ 2.62, which Terra Firma interpreted as (i) a market indicator of EMI's value, and (ii) an indication that the EMI auction would not be a "busted auction" (which would have suggested that the true value/acquisition cost of EMI was much lower than any auction participant would have concluded on its own).

137.    In fact, however, Citi's representations to Terra Firma were knowingly false, and were deliberately and maliciously designed to fabricate a false competitive landscape that would elicit a bid from Terra Firma.  Specifically:

34

a. At no time did Cerberus or anyone else other than Terra Firma submit, or decide to submit, a binding offer for EMI at any price;

b. Cerberus signaled to Citi and EMI its likely intent to withdraw from the bidding process on Saturday May 19, 2007; and

c. During the afternoon of May 20, 2007, Cerberus formally informed EMI that it had exited the auction and would not be submitting a bid.

138.    Upon information and belief, Mr. Wormsley was in regular contact with EMI on May 19 and 20 and the early morning hours of May 21, 2007. EMI, through Mr. Nicoli, kept Mr. Wormsley, as EMI's lead investment advisor and one of the people who ran the auction, informed of the true facts of the discussions between EMI and Cerberus, including Cerberus' withdrawal from the bidding process. Despite knowing these true facts, Mr. Wormsley not only made the false statements set forth herein—including reiterating to Terra Firma that Cerberus was participating in the auction and would win the auction if Terra Firma did not submit its bid the following morning—but made no attempt to inform Terra Firma that his own representations were incorrect, and that Cerberus was not participating, at any price, in the auction for EMI on May 21, 2007.

139.    Mr. Wormsley's continued repetition of the false representations above, up until Terra Firma submitted a bid on May 21, was fraudulent. And, his failure to correct those representations was, at a minimum, negligent and fell below the standard to be expected of a reasonably competent investment banker in Mr. Wormsley's position.

140.    In making the misrepresentations to Mr. Hands described above, Mr. Wormsley was aware that Mr. Hands and Terra Firma would believe and rely on the misrepresentations in

35

deciding whether to make a bid for EMI and at what price to bid; and in fact intended for Mr. Hands and Terra Firma to believe and act upon the misrepresentations.

141.    Mr. Wormsley deliberately created the impression that by reason of Citi's existing relationship with EMI, and Mr. Wormsley's relationship with Mr. Nicoli, Citi was in a position to provide Terra Firma with relevant information regarding pricing and competition, and that in providing Terra Firma with such information, Citi was acting with the knowledge and approval of EMI and Mr. Nicoli.

142.    Citi, with Mr. Wormsley as its agent and the knowledge of Mr. Nicoli, made the misrepresentations set forth above with the intent to deceive Terra Firma into submitting the Offer on Monday, May 21, 2007.  Citi believed and intended that the Offer would be accepted, and believed that Terra Firma would, through its acquisition vehicles, enter into various loan agreements with Citi, thereby generating substantial fees and income for Citi.  Accordingly, it was in Citi's and Mr. Wormsley's interests to try to ensure that Terra Firma submitted the highest possible bid in order to maximize its chances of success.  Because of the relationships of the individuals and entities involved, Citi had a duty to disclose the true course of events and correct any misrepresentations or omissions in its communications with Terra Firma.

143.    Terra Firma believed and reasonably relied on Citi's misrepresentations.

### *EMI's Acceptance of Terra Firma's Offer*

144.    In the absence of any competing bid, EMI's Board of Directors accepted the Offer on May 21, 2007.  Terra Firma (through its acquisition vehicle MAL) and EMI issued a joint public announcement regarding EMI's acceptance of the Offer.

145.    The Offer was subject to acceptance by 90% of EMI's shareholders, which occurred on August 1, 2007.  On August 13, 2007, Terra Firma financed the Acquisition with

36

approximately £ 1.5 billion of its own capital and approximately £ 2.5 billion borrowed by affiliates of Terra Firma from Citi pursuant to revised loan agreements ("the Facilities Agreements"). Pursuant to the Facilities Agreements, Terra Firma's affiliates pledged to Citi the EMI shares acquired in the Acquisition as security for the borrowing under those agreements.

146.    In reliance upon Citi's misrepresentations, Terra Firma submitted the Offer. If Terra Firma had known the true facts it would not have submitted any offer for EMI on Monday, May 21, 2007, but rather would have insisted on full additional due diligence and performed its own independent and detailed analysis of the company—the kind of analysis that would normally follow a busted auction.

147.    Terra Firma has suffered loss and damages as a result of Citi's misrepresentations. Among other things, the trading value of EMI stock on the date of the Offer was artificially high as a result of the supposed competitive bidding process. If Citi had not made the misrepresentations to Terra Firma and the "busted" auction had become public, the trading value of EMI stock would have been substantially lower after Monday May 21, 2007.

### III. The Aftermath of the Fraud:  Citi Seeks to Mislead the Market Regarding EMI's Financial Condition.

148.    Once the Facilities Agreements had been finalized Citi set to work on the syndication of the debt. It had been Citi's intention to shift the majority of the £ 2.5 billion EMI loans off of Citi's balance sheet, and the substantial pressures on the liquidity of banks at this time only increased Citi's motivation to do so. The securitization market had effectively ceased to exist by the last quarter of 2007 and the planned securitization of EMI's music publishing revenues was no longer feasible. Citi was thus limited to syndicating the debt to the bank market in order to shift the EMI debt off of its own balance sheet. Not surprisingly given the market conditions in 2007 Citi faced market resistance to the syndication of EMI's debt. Citi was aware

37

that certain provisions within the Facilities Agreements were more favorable to EMI than those prevailing in the market after the onset in 2007 of the credit crunch, and therefore set about exerting pressure on Terra Firma and EMI to force the renegotiation of many of these terms.

149.   For example, after Citi had agreed to provide Terra Firma with the financing for the Acquisition and Terra Firma had relied on that agreement in submitting its bid, Citi forced Terra Firma to renegotiate the terms of the financing.   Between May and July 2007, based on the Commitment Letter and Term Sheet, Citi and Terra Firma had worked together to document the loan agreements pursuant to which Citi would finance the transaction.  By mid-July, once the credit markets had tightened, Citi refused to finalize those documents and sought instead to change the agreement that the parties had reached.  On August 8, 2007, in a meeting at Citi's offices in New York, Citi informed Terra Firma that it would only be prepared to provide long-term financing based on the Commitment Letter and Term Sheet if Terra Firma injected significant additional equity into EMI to reduce Citi's exposure.  Considering that EMI had already accepted Terra Firma's offer, Terra Firma was committed to closing and funding the transaction, and needed Citi's financing to do so.   Therefore, Terra Firma had no choice but to agree to Citi's more onerous terms and introduce an additional £ 210 million into EMI, reducing the mezzanine portion of the term loan provided by Citi from £ 365 million to £ 155 million.

150.   Moreover, despite having entered into the Facilities Agreements, Citi has not acted as a normal lender.  In the ordinary course, a reasonable lender would be incentivized to ensure that their debtors succeeded and had the capacity to repay their loans.  But Citi has acted differently, and sought to wrest control of EMI by pushing it into, or to the brink of, bankruptcy. It is deliberately imposing extreme and unfair economic pressure on Terra Firma and EMI.

151.   Citi has undermined Terra Firma's equity interest in EMI by repeatedly putting pressure on EMI in order to force EMI to default on its obligations.

152.   For example, the Facilities Agreements provided that MAL and MIL (collectively "Maltby") were obligated to implement a security package to secure Citi's debt against the assets of the business. Citi's cooperation was required in order for the implementation deadline to be met. Citi was not cooperative and in discussions during the security implementation process Citi made it clear that even reasonable requests for cooperation would be refused in order to ensure that its concerns over restructuring and syndication of the debt would be addressed in negotiations with Terra Firma/Maltby. Citi's lack of cooperation both (i) put Terra Firma/Maltby at serious risk of not meeting the deadline (and thereby defaulting) and (ii) imposed significant cost and delay by forcing them to work around Citi's lack of cooperation.

153.   In fact, Citi's more aggressive efforts have been aimed at taking control of EMI away from Terra Firma by attempting to push EMI into, or to the brink of, insolvency. Citi understands that, if its efforts are successful, Terra Firma will suffer harm.

154.   By September 2009 Citi's ability to place pressure on Terra Firma/Maltby through the Facilities Agreements was limited by the fact that the Facilities Agreements were "covenant-light" loan documents. The only financial covenant test in the documents is the quarterly debt to EBITDA ratio for each of Recorded Music and Music Publishing. Should EMI fail to meet such a test, Citi would argue that it is in a position to take control of the business.

155.   In September 2009, Citi published a 21-page, publicly distributed "research report" (the "Citi Report"). While nominally labeled an analyst report regarding the publicly traded stock of *Warner*, the core of the Citi Report was a broadside attack on Terra Firma, its investment in EMI, and its reputation. Citi launched the attack in order to create marketplace

39

uncertainty about EMI's ability to operate as a going concern, thereby damaging EMI's current and prospective business relationships and profitability, and undermining Terra Firma's ability to manage EMI successfully.

156.    In other words, Citi's objective in publishing the Citi Report was to undermine EMI's performance, causing the business to fail the quarterly covenant test and thereby allow Citi to wrest control of EMI from Terra Firma. As implied in the Citi Report, Citi intends to sell EMI to Warner, thus maximizing its recovery on its EMI-related loans, and generating additional investment banking fees from Warner.

157.    Despite Citi's confidentiality obligations under its loan agreements with Terra Firma's affiliates, the Citi Report was peppered with inflammatory accusations that Terra Firma's equity investment in EMI is—or is on the brink of becoming—worthless, and that Terra Firma is in danger of losing control of EMI. In the Citi Report Citi also sought to obfuscate its role as sole issuer and holder of EMI debt. Citi alone provided the financing and Citi alone holds the debt, having been unable to syndicate it or otherwise reduce its exposure to EMI. Nevertheless, in an effort to make the Citi Report appear more objective and maintain greater market credibility, the Citi Report ascribed various questions to anonymous "banks" that supposedly held EMI's debt, saying for example that a key question was whether "the bank*s* accept Terra Firma's offer, wait for the industry to turn around, or push EMI into insolvency[.]" (emphasis added). The Citi Report answered that question as "depend[ing] on how confident the bank*s* are that *they* will get *their* money back if the assets are subsequently sold." *Id.* (emphasis added). Of course, there is only one bank with any such interest: Citi.

158.    The Citi Report went so far as to accuse Terra Firma and EMI of issuing mis-leading financial statements, stating that Citi was "a bit leery of using" EMI's most recent

40

publicly disclosed EBITDA figures in valuing EMI's businesses.  Citi intended and knew that these false comments would be perceived as reliable in the financial community, due to Citi's status as the sole lender to Terra Firma in its purchase of EMI.

159.    Perhaps most damaging was the Citi Report's public speculation about what would happen "if EMI files for Chapter 11 and the banks sell the assets," meaning that "Terra's equity and the shareholder loan are wiped out, leaving £ 2.7 billion in bank debt."  The public discussion of this possibility by Citi—which the financial community knows to have confidential information regarding Terra Firma and EMI by virtue of Citi's status as sole lender—created significant downward pressure on the public's perception of EMI and its core businesses, and caused significant damage to the reputations of EMI and Terra Firma.

160.    Citi intended and knew that the effect of its public attack would be to devalue the core businesses of Terra Firma and EMI by restricting its ability to generate revenue and compete with the other music companies.

161.    For example, artists who are considering signing contracts with EMI are less likely to do so as a result of the Citi Report, and more likely to sign instead with either Warner or one of the other major music labels.

162.    Similarly, other parties have refused to enter into agreements or have insisted on more onerous financial or termination conditions based on the concerns Citi raised in the Citi Report related to EMI's finances.

163.    The purpose behind Citi's smear campaign is to force these artists and counterparties to refuse to do business with EMI, thereby undermining EMI's ability to generate revenue and, hence, to meet the financial covenants in the Financing Agreements.

41

164.     What has been lost in all of Citi's efforts and its strategic public relations attack is that under Terra Firma's control, EMI's results and prospects have in fact improved significantly—far more so than Citi originally envisioned when it extended the loan.  Terra Firma has engaged in large cost-cutting and restructuring.  For example, Terra Firma has invested an additional £ 250 million to restructure the business into three distinct global business units: new music, catalogue, and music services, and each division is being held responsible for its own profits or losses.  Under Terra Firma's ownership, EMI recruited a new executive team including a new CEO, new managers for each business unit, and new A&R leadership. New management has embedded strong controls in the organization including a new Capital and Special Expenditures ("CSE") process.

165.     Under Terra Firma's direction, EMI has focused on cost savings and overhead reduction, resulting in the identification of £ 200 million of cost savings that EMI expects to achieve by March 2010.  The new structure has allowed the business to reduce overheads and implemented an employee headcount reduction of 1,500 in June 2008.  EMI has also engaged in other substantial restructuring efforts, including re-sizing the roster of artists represented, a focus on achieving target returns on investment, and a comprehensive restructuring of the physical supply chain organization in the US and Europe.

166.     As a result of these and other efforts, Terra Firma has turned EMI around—dramatically.  For example, in 2008-09, EMI's Recorded Music division managed to more than triple its EBITDA from £ 51 million to £ 163 million as a result of its operational restructuring efforts.  And EMI's cash-flow has done even better, going from a cash flow loss of £ 144 million for the year March 2007 through March 2008 (during which period Terra Firma acquired EMI)

to generating a positive £ 190 million in cash flow between March 2008 and March 2009—a turnaround totalling £ 334 million.

167.    EMI's potential, however, is being constrained by its debt load—and by Citi's actions to prevent EMI from maximizing its potential revenue and EBITDA.  The price Terra Firma paid—a price based on the Defendants' fraud—has meant that the company is saddled with far more debt than it should have.  That increased debt has had a number of ramifications, including requiring the company to make increased interest payments, limiting EMI's operational flexibility, and imposing constraints on EMI's available capital and therefore its ability to pursue infrastructure and technology projects and other investment opportunities that would enable the company to be more competitive.

## CAUSES OF ACTION

### Count One:  Fraudulent Misrepresentation

168.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

169.    Defendants intentionally misrepresented material information to Plaintiffs in connection with Plaintiffs' purchase of EMI.

170.    At the time of these misrepresentations, Defendants knew of the falsity of the material information that they intentionally provided to Plaintiffs, and intended for Plaintiffs to rely on those misrepresentations.

171.    Plaintiffs relied to their detriment on the material misrepresentations made by Defendants to Plaintiffs in connection with Plaintiffs' purchase of EMI.

172.    Plaintiffs suffered damages as a direct result of Defendants' material misrepresentations to Plaintiffs.  In the absence of Defendants' misrepresentations, Plaintiffs

would not have submitted any offer to buy EMI on May 21, 2007. To the extent that Plaintiffs would have submitted a later offer, it would have been substantially lower than the £ 2.65 per share bid that Defendants elicited through their misrepresentations and indeed, upon information and belief, would have been so low that the EMI Board would have rejected the offer. Thus, Defendants' material misrepresentations were the direct and proximate cause of Plaintiffs' damages.

173.    It was foreseeable to Defendants that Plaintiffs would suffer damages as a result of Defendants' material misrepresentations.

174.    Defendants' misrepresentations constituted gross misconduct that was willful, wanton and malicious, and that was committed with a reckless disregard for the law.

**Count Two:  Negligent Misrepresentation**

175.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

176.    Defendants misrepresented material information to Plaintiffs in connection with Plaintiffs' purchase of EMI in a manner that was, at a minimum, careless and negligent.

177.    At the time of the misrepresentations, Defendants had a duty to know whether the information they were providing to Plaintiffs was true. Defendants' duty arose from, among other things, their unique, specialized and superior knowledge of the process by which EMI was placing itself for sale, including the status of all bids made in connection with that auction and sale; and Defendants' unique and specialized knowledge of the business of Terra Firma learned as a result of Defendants' longstanding and lucrative business relationship with Terra Firma.

178.    Defendants made these misrepresentations directly to Plaintiffs, and with the knowledge and intent that Plaintiffs would rely and act upon Defendants' misrepresentations.

44

179.    Plaintiffs reasonably relied and acted on Defendants misrepresentations regarding the auction.

180.    Plaintiffs suffered damages as a result of their reliance on Defendants' misrepresentations.  In the absence of Defendants' misrepresentations, Plaintiffs would not have submitted any offer to buy EMI on May 21, 2007.  To the extent that Plaintiffs would have submitted a later offer, it would have been substantially lower than the £ 2.65 per share bid that Defendants elicited through their misrepresentations, and indeed, upon information and belief, would have been so low that the EMI Board would have rejected the offer.  Thus, Defendants' material misrepresentations were the direct and proximate cause of damages to Plaintiffs.

181.    It was foreseeable to Defendants that Plaintiffs would suffer damages as a result of Defendants' material misrepresentations.

### Count Three:  Fraudulent Concealment

182.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

183.    Defendants intentionally concealed and failed to disclose material information to Plaintiffs in connection with Plaintiffs' purchase of EMI.

184.    At the time of their unlawful concealment of material information from Plaintiffs, Defendants had a duty to disclose that information to Plaintiffs.  Defendants' duty arose from, among other things, their unique, specialized and superior knowledge of process by which EMI was placing itself for sale, including the status of all bids made in connection with that process; and Defendants' unique and specialized knowledge of the business of Terra Firma learned as a result of Defendants' longstanding and lucrative business relationship with Terra Firma.

45

185.    Defendants made partial or ambiguous statements to Plaintiffs regarding the status of the process by which EMI was placing itself for sale. As a result of Defendants' communication of partial or ambiguous information to Plaintiffs, Defendants had an affirmative duty to correct or clarify those partial or ambiguous statements. Defendants failed to make any such correction or clarification.

186.    Defendants knew that Plaintiffs were acting on the basis of incorrect facts.

187.    Defendants' concealment of material information from Plaintiffs was intended to mislead and defraud Plaintiffs.

188.    Plaintiffs reasonably relied and acted on their belief that Defendants had not concealed any material information that Defendants had an obligation to disclose to Plaintiffs.

189.    Plaintiffs suffered damages as a result of Defendants' concealment of material information that Defendants had a duty to disclose to Plaintiffs. In the absence of Defendants' concealment, Plaintiffs would not have submitted any offer to buy EMI on May 21, 2007  To the extent that Plaintiffs would have submitted a later offer, it would have been substantially lower than the £ 2.65 per share bid that Defendants elicited through their unlawful concealment of material information from Plaintiffs, and indeed, upon information and belief, would have been so low that the EMI Board would have rejected the offer. Thus, Defendants' unlawful concealment was the direct and proximate cause of damages to Plaintiffs.

190.    It was foreseeable to Defendants that Plaintiffs would suffer damages as a result of Defendants' concealment of material information from Plaintiffs.

191.    Defendants' concealment constituted gross misconduct that was willful, wanton and malicious, and in reckless disregard for the law.

46

**Count Four: Tortious Interference with Prospective Economic Advantage**

192.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

193.    In connection with their ownership of EMI, Plaintiffs have a significant equity-linked interest in EMI's financial success.

194.    Defendants were aware of Plaintiffs' business relationship with EMI.

195.    Defendants intentionally and maliciously interfered with Plaintiffs' business relationship with EMI through unfair and improper means, including but not limited to extreme and unfair economic coercion through, among other things, the misleading statements in the Citi Report in September 2009.

196.    Defendants' unlawful and malicious actions have caused damage to Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)    Awarding Plaintiffs their actual and consequential damages in an amount to be established at trial, together with punitive or exemplary damages under applicable law, as a result of the facts alleged herein and such other facts established at trial;

(b)    Awarding Plaintiffs disgorgement of all money received by Defendants in connection with the sale of EMI, and all profits made in connection with trading of EMI stock between May 2007 and September 2007;

(c)    Awarding Plaintiffs pre-judgment and post-judgment interest on their actual damages at the rates prescribed by applicable law;

(d)    Preliminarily and permanently enjoining Defendants from continuing to act in a way designed to damage the value of Plaintiffs' equity interest in EMI;

(e)    Awarding Plaintiffs their costs and expenses in this litigation, including their attorneys' fees, expert fees, and other costs and disbursements;

(f)    Awarding Plaintiffs such other and further relief as this Court may deem just and proper under the circumstances.

## Jury Demand

Plaintiffs demand a jury trial in this action.

Dated: December 11, 2009
      New York, New York

Respectfully submitted,

David Boies
(DBoies@BSFLLP.com)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
(914) 749-8200

Jonathan Sherman
(JSherman@BSFLLP.com)
William C. Jackson
(WJackson@BSFLLP.com)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
(202) 237-2727

Christopher E. Duffy
(CDuffy@BSFLLP.com)
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

*Attorneys for Plaintiffs Terra Firma
Investments (GP) 2 Limited, and Terra
Firma Investments (GP) 3 Limited*

48