UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
TERRA FIRMA INVESTMENTS (GP) 2          :
LIMITED, and TERRA FIRMA INVESTMENTS    :
(GP) 3 LIMITED,                         :    09 Civ. 10459 (JSR)
                                        :
            Plaintiffs,                 :    MEMORANDUM
                                        :
            -v-                         :
                                        :
CITIGROUP INC., CITIBANK, N.A.,         :
CITIGROUP GLOBAL MARKETS LIMITED, and   :
CITIGROUP GLOBAL MARKETS INC.,          :
                                        :
            Defendants.                 :
------------------------------------- x



JED S. RAKOFF, U.S.D.J.

In this action, plaintiffs Terra Firma Investments (GP) 2 Limited and Terra Firma Investments (GP) 3 Limited (collectively, "Terra Firma") have brought suit against defendants Citigroup Inc., Citibank N.A., Citigroup Global Markets Limited, and Citigroup Global Markets, Inc. (collectively, "Citi"), alleging that Citi engaged in fraudulent misrepresentation (Count 1), negligent misrepresentation (Count 2), fraudulent concealment (Count 3), and tortious interference with prospective economic advantage (Count 4), all in connection with Terra Firma's acquisition of the well-known music company, EMI Group. See Compl. ¶¶ 168-196. Following extensive discovery, defendants filed for summary judgment on August 13, 2010, seeking dismissal of all claims. After receiving full briefing from the parties, the Court heard oral argument on September 10, 2010. On September 14, 2010, the Court issued a "bottom-line" Order granting

Citi's motion with respect to the negligent misrepresentation and tortious interference claims and denying Citi's motion with respect to the fraudulent misrepresentation and fraudulent concealment claims, with opinion to follow. Although the trial of the remaining claims is now ongoing, it is still relevant for the parties to have the Court's reasoning with respect to the dismissal of two claims on summary judgment, so this is that opinion.

The pertinent facts presented at the time of summary judgment, either undisputed, or, where disputed, taken most favorably to plaintiffs, are as follows. The plaintiffs are part of a broader group of Terra Firma entities and are the general partners, respectively, of the six limited partnerships that constitute the Terra Firma Capital Partners II Fund and the Terra Firma Capital Partners III Limited Partnership. See Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("Def. 56.1") ¶ 1; Response of Plaintiffs Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd. To Defendants' Statements of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 1.[1] In making investment decisions, the plaintiffs receive advice from Terra Firma Capital Partners, Ltd. ("TFCPL"), which typically presents recommendations through its

---

[1] All citations to a party's statement of undisputed facts made pursuant to Local Rule 56.1 incorporate the corresponding paragraphs of the opposing party's response.

Investment Advisory Committee ("IAC"). See Loveridge Dep. at 54-55; Stokes Dep. at 59-60. However, final investment decisions are made by the plaintiffs' boards of directors. Stokes Dep. at 59-60. In May of 2007, the board of directors of the two plaintiffs consisted of John Loveridge, Iain Stokes, Fraser Duncan, Nigel Carey, and Guy Hands, and the CEO of TFCPL was Guy Hands.

Between 2006 and 2007, EMI endured financial difficulties and sought to merge, unsuccessfully, with Warner Music Group ("Warner"), or to put the company up for auction. Compl. ¶¶ 6, 8. On April 20, 2007, EMI's board met to discuss the potential sale of the company. Def. 56.1 ¶ 23. By the time of this meeting, two private equity firms, Cerberus and Fortress, had put in so-called indicative bids for EMI -- i.e., non-binding bids subject to due diligence. See Def. Exs. 12-13. On April 23, 2007, a third private equity firm, One Equity, submitted an indicative bid in the same range as Fortress. Def. 56.1 ¶ 26. Terra Firma continued to evaluate whether it should submit a potential bid and sought advice from financial and industry experts to assist in this evaluation. See Pl. 56.1 ¶ 29; Def. Ex. 19; MacInnes Dep. at 64.

On May 6, 2007, Hands met with Eric Nicoli, the CEO of EMI, to ask questions regarding Terra Firma's business plan assumptions for EMI. Pl. 56.1 ¶ 31-32. After the meeting, Hands instructed Riaz Punja, a managing director of TFCPL, to prepare a memorandum for the IAC recommending an indicative bid of £2.65 per share. See Def. Ex.

3

24. On May 7, 2007, Hands wrote an email to Punja as well as the members of the IAC outlining nine reasons he believed "it [was] worth spending time to focus on [the EMI acquisition]." Def. Ex. 25. On May 8, 2007, the plaintiffs submitted an indicative bid for EMI. Pl. Ex. 118.

On May 9, 2007, plaintiffs and EMI executed the Project Mulberry Agreement (the "PMA") which, among other things, provides that information supplied to plaintiffs by EMI "does not purport to be all-inclusive and that no representation or warranty is made by any person as to the accuracy, reliability or completeness of any of the Information." See Def. Ex. 29 at 5. Information is defined as "information supplied by each of us or by any of our respective Connected persons orally, in writing or in any other form to the other or its Authorized Recipients whether before, on or after the date of this letter in connection with the Proposal..." Id. at 1. It further provides that neither party nor any of their "Connected Persons"[2] shall be liable to the other or any other person resulting from the use of "Information" provided by one party or the other and neither party "nor any of [their] respective Connected Persons shall owe a duty of care to the other, to the other's Connected Persons or to any other Person." Id. at 5. The PMA seemingly negates any

---

[2] "Connected Persons means, in relation to each of us, to the extent that they are involved in or have knowledge of the Proposal ... (b) officers, employees and partners of our advisors, agents and representatives or of their respective group undertakings" ... Id. at 1-2.

liability for negligence. The PMA does not, however, limit liability for fraud, for it provides that "[n]othing in this letter excludes any liability for, or remedy in respect of, fraudulent misrepresentation." Id. at 5.

While, in connection with the auction for EMI, binding offers were initially due on May 23, 2007, on May 18, 2007, EMI decided to require that bids be submitted by 9:00 A.M. on May 21, 2007. Borrows Dep. at 84-89, 252; Nicoli Dep. at 109-110; Def. Exs. 54-55. On May 19, Cerberus's investment bankers informed Simon Borrows, the lead banker at Greenhill & Co. (the company serving as EMI's primary financial advisor), that Cerberus had decided not to place a bid. Borrows Dep. at 112-114. Greenhill advised EMI's senior management about this decision in a conference call on the morning of May 20. Def. 56.1 ¶ 70. There is no evidence that David Wormsley, a senior Citi investment banker and the head of the M&A Team of Citigroup Global Markets Limited, participated in this conference call. Two of the conference call participants -- Simon Borrows and Peter Bell -- testified that they did not convey information about the conference call to Wormsley or anyone at Citi and three of the conference call participants -- Nimrod Barak, Eric Nicoli, and Martin Stewart -- testified that they do not recall conveying any information to Wormsley or anyone at Citi. See Borrows Dep. at 128; Bell Dep. at 324; Nicoli Dep. at 158, 192-93; Stewart Dep. at 141-42; Barak Dep. at 59-61. Wormsley testified that he does not recall being told at

5

or prior to this time that Cerberus was not planning to bid. See Wormsley Dep. at 274.

Between May 18 and May 20, Hands allegedly had three conversations with Wormsley in which Wormsley told Hands that Cerberus intended to bid £2.62 per share for EMI on May 21 and that Terra Firma needed to bid £2.65 to win the auction for EMI. Def. 56.1 ¶ 75. Hands allegedly revealed the gist of the information he obtained from Wormsley to the directors present at a Terra Firma board meeting held on May 20. Id. ¶ 77. According to Hands, Wormsley's statements regarding the Cerberus bid were the "sole" reason Terra Firma bid at £2.65. Hands Dep. at 241, 250-251. Two other directors who ultimately voted in favor of the bid similarly allege that the information Hands received from Wormsley played a substantial role in Terra Firma's decision to bid on EMI: Loveridge testified that the information was the "main reason for the bid" and Stokes testified that the information served as the "catalyst" for the bid. Loveridge Dep. at 226; Stokes Dep. at 55, 90, 92. While the official minutes of the May 20 Terra Firma board meetings make no reference to the Cerberus bid, see Def. Exs. 72-73, handwritten notes of the May 20 IAC meeting taken by the minute-taker, Kirsten Randell, reflect that a question had been asked about other bidders and the answer "one at 262" was given. See Decl. of Kirsten Randell, Aug. 2010, Ex. A. Moreover, draft minutes of a May 21 Terra Firma meeting state that "the consortium of Cerberus and Fortress had made an offer

6

of £2.63 per [] share," although this information is not reflected in the final version of these minutes. See Pl. Ex. 143; Def. Ex. 74.

On May 18, the plaintiffs' directors approved a plan to acquire EMI with investment of "up to 2.65 or such lesser sum as may be negotiated," Def. Ex. 68 at 4, and thereafter, on May 21, approved making at bid at £2.65. At 9 A.M. on May 21, 2007, Terra Firma, on behalf of the English acquisition vehicle they had created, Maltby Limited, submitted to EMI a formal letter offering to purchase EMI at £2.65. See Def. Exs. 74-75; Def. 56.1 ¶ 101. Neither Cerberus nor any other entity submitted a bid for EMI. Def. 56.1 ¶¶ 106, 118.

Terra Firma's offer was subject to the condition that 90% of EMI's shareholder accept it. Compl. ¶ 145. On June 27, 2007, only 4% of EMI's shareholders had accepted Terra Firma's offer, leading Terra Firma to extend the deadline for shareholder approval five times until, on August 1, 2007, 90% of EMI shareholders had approved the deal. See Compl. ¶ 145; Def. Exs. 79, 81-84. The closing took place on August 17, 2007. Def. Ex. 86 at 3. Plaintiffs spent approximately £1.502 billion in equity to acquire EMI and borrowed the remaining £2.74 billion from Citi through financing agreements entered into on August 13, 2007. Def. 56.1 ¶ 116. Upon the closing of the transaction, Maltby Limited (now known as Maltby Acquisitions Limited), a vehicle created by Terra Firma to undertake the EMI transaction, became the sole shareholder. Id. ¶¶ 130-131. The plaintiffs indirectly own EMI through intermediate holding companies

and are not parties to any financing agreements with Citi since the EMI debt is currently owned by Maltby Acquisitions Limited ("Maltby"). Id. ¶¶ 132, 134.

At some point subsequent to the closing, Terra Firma discovered that Cerberus had in fact never bid on EMI. On September 24, 2007, Terra Firma managing director Stephen Alexander (who is now the Chairman of the holding company that controls EMI) emailed Hands that he understood that Cerberus had done due diligence but never actually submitted a formal offer for EMI. See Def. Ex. 93. In the second quarter of 2008, Terra Firma's general counsel Tim Pryce definitively told Hands that Cerberus had not bid on EMI. Def. 56.1 ¶ 123. Even after learning that Cerberus had not bid, Hands did not immediately confront Wormsley or anyone at Citi and Terra Firma continued to work with Citi.

Because of concerns that Maltby would be unable to meet its debt obligations, Terra Firma made various proposals to Citi to restructure the Maltby debt throughout 2009, but the parties never reached agreement. Id. ¶ 139. On September 15, 2009, Citigroup's research division issued an analyst report on Warner (the "Analyst Report") authored by media analyst Jason Bazinet. Def. 56.1 ¶ 143. In this report, Bazinet opined that EMI's financial difficulties could lead to a possible merger of EMI and Warner. Id. ¶ 144. The Analyst Report commented upon EMI's financial prospects, EMI's relationship with Terra Firma, and the prospect of the lender

8

enforcing its rights under the loan agreements, "push[ing] EMI into insolvency." Def. Ex. 119 at 7-8.

According to Bazinet, his calculations of "synergies" of an EMI/Warner merger and all factual statements about EMI were based on public sources. See Bazinet Dep. at 87, 184-185. Bazinet also testified that Citi has procedures in place that prohibit research professionals from communicating with Citi bankers and that he and his group comply with these procedures. Id. at 184, 199 (stating that the research department has a "totally separate function" from the banking department and "operate[s] in [an] isolated silo"). Bazinet contends that, at the time he wrote the report, he did not know Citigroup was the sole lender for the EMI acquisition. Id. at 72. The report itself, however, contains a citation to an article which said "Citi was left holding the entire debt package," see Def. Ex. 119 at 7, Pl. Ex. 112, and, on October 14, 2009, Bazinet wrote an email to Scott Cohen, another Citi analyst, that said "citi is the holder of the emi debt, and we are playing hard ball." See Pl. Ex. 113. Terra Firma alleges that Citi's actions, including its publication of the Analyst Report, forced Terra Firma to invest an additional £66.6 million in equity to retain its relationship with EMI. See Memorandum of Law of Terra Firma Investments (GP) 2 Ltd. and Terra Firma Investments (GP) 3 Ltd. In Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 34.

Based on these facts, Terra Firma brought four causes of action:

three in connection with the purchase of EMI (fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment) and a fourth cause of action for tortious interference with prospective economic advantage based on allegations that Citi interfered with Terra Firma's relationship with EMI by publishing misleading statements in the September 2009 Analyst Report. Compl. ¶¶ 168-196. After careful consideration of the parties' submissions on summary judgment, the Court reached the following conclusions:

First, Terra Firma is barred from bringing the negligent misrepresentation claim by the plain language of the PMA -- the letter agreement entered into between EMI and Terra Firma on May 9, 2007. The PMA clearly states that neither party nor any of their "Connected Persons" shall be liable to the other or any other person resulting from the use of "Information"[3] negligently provided by one party or the other. Def. Ex. 29 at 5. Terra Firma concedes that the PMA is an enforceable agreement that contains a waiver of liability for any negligence claim based on information supplied by EMI and/or any of EMI's Connected Persons to Terra Firma and/or any of Terra Firma's Connected Persons. Terra Firma nonetheless argues that the terms of the PMA do not apply to its negligent misrepresentation claim against Citi because the PMA does not cover communications

---

[3] "Information" is defined broadly to include any information "supplied by each of us or by any of our respective Connected persons orally, in writing or in any other form to the other or its Authorized Recipients whether before, on or after the date of this letter in connection with the Proposal." Def. Ex. 29 at 1.

10

between Terra Firma and its own Connected Persons. It contends that while Wormsley was one of EMI's Connected Persons, he was acting as a Connected Person for Terra Firma at the moment he provided false information to Hands. See Pl. Mem. at 31-32. Even assuming arguendo that Wormsley was acting as a Connected Person for both Citi and Terra Firma -- something that is not clear from the summary judgment record -- Terra Firma's argument is too clever by half. Given that it is undisputed that Wormsley was a Connected Person of EMI, the PMA plainly applies to any information Wormsley passed on to Hands that was relevant to the potential EMI acquisition. The suggestion that the liability waiver is contingent upon a determination that Wormsley was acting as a Connected Person of EMI "at the moment" the information was transferred is a nicety almost certainly not considered by the drafters of the PMA or relevant to its interpretation. Thus, the Court affirms its previous ruling finding that Terra Firma's negligent misrepresentation claim must fall.

Second, Terra Firma has failed to come forward with sufficient evidence to establish a prima facie case of tortious interference. This is true regardless of whether New York law or English law governs this claim. While the parties agree that English law governs the other three claims, there is a disagreement about which law governs the tortious interference claim. Citi contends that English law applies, while Terra Firma contends that New York law applies.

Since this case is in federal court pursuant to the Edge Act,[4] 12 U.S.C. § 632, federal choice of law principles apply. See Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980). Generally speaking, federal courts will apply the law of the jurisdiction with "the most significant relationship to the occurrence and the parties." See Restatement (Second) of Conflict of Laws § 145(1). Terra Firma contends that New York law governs because the location of defendant's conduct is generally the most significant factor for competition-related torts and, here, the Analyst Report was published in New York. See Pl. Mem. at 24 (citing Restatement (Second) of Conflict of Laws § 145, cmt. (f); Grupo Televisa, S.A. v. Telemundo Commc'ns Group, Inc., 485 F.3d 1233, 1240-41 (11th Cir. 2007)). Citi counters that choice of law determinations cannot be based on a single factor and that English law should govern all of the claims since England has "the

---

[4] The Edge Act provides:
> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking,... or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions ... shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for removal of causes otherwise provided by law.

12 U.S.C. § 632.

most significant relationship to the occurrence and the parties." Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 20 (quoting Restatement (Second) of Conflict of Laws §§ 148(2), 145).

Given that most of the conduct relating to the tortious interference claim occurred in New York, the Court finds that New York law governs the tortious interference claim. However, this determination is immaterial given that under English law, Terra Firma's claim would also fail as it is more difficult to prevail on this claim under English law than it is under New York law.[5] To establish a claim for tortious interference under New York law, the plaintiffs must establish the following elements: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." See Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d

---

[5] Indeed, the elements required to establish tortious interference are less demanding than the elements of the English-law equivalent, the tort of causing loss by unlawful means. In order to prevail under English law, the plaintiff would have to show that the defendant used independently unlawful means against a third party, affecting the third party's freedom of action to deal with the plaintiff. See Future Investments SA v. FIFA, [2010] EWHC (Ch) 1019, [19]-[21] (Eng.). Additionally, the English doctrine of "reflective loss" precludes a shareholder from bringing an action for diminution in the value of the shareholder's investment where that diminution merely reflects the loss suffered by the company. See Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2), [1982] Ch. 204 at 210 (Eng.).

13

Cir. 2000); Harger v. Price, 204 F. Supp. 2d 699, 709 (S.D.N.Y. 2002). Terra Firma's claim fails because the facts do not establish the third element -- that Citi acted solely to harm Terra Firma or committed the sort of "egregious wrongdoing" that would support a tortious interference claim. See Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1108 (2004). While Terra Firma claims that Citi prepared the Analyst Report in order to harm Terra Firma and suggests that Bazinet used non-public information in preparing the report, there is no competent evidence of this.

Bazinet has testified that he only relied on public information in preparing his report and that, as a member of Citi's research group, he was not privy to any private information regarding the relationship between Citi and Terra Firma. Bazinet also testified that, at the time he prepared the report, he did not know that Citi was the sole holder of the EMI debt. In order to counter his testimony and suggest that Bazinet did in fact have access to non-public information, Terra Firma points to two pieces of evidence: the citation in the Analyst Report to an article which states "Citi was left holding the entire debt package" and the email that Bazinet sent to another analyst which said "citi is the holder of the emi debt, and we are playing hard ball." See Pl. Mem. at 34 (quoting Ex. 113). This evidence alone is insufficient to demonstrate that Citi acted improperly. The mere fact that Bazinet cited to an article that stated that Citi was the sole lender does not demonstrate that

14

Bazinet was being untruthful in his deposition -- since citing to an article does not necessarily imply knowledge of every statement in th article -- and, more importantly, does not demonstrate that Bazinet had non-public knowledge since the article itself is a public source. Also, the email that Terra Firma references was sent after the report was issued, so this evidence similarly fails to contradict Bazinet's testimony that, at the time the report was issued, he did not know Citi was the sole holder of the debt. While Bazinet's statement in the email that Citi is "playing hardball" is more suggestive of impropriety than any other evidence in the record, it is still not sufficient for a reasonable jury to infer that Bazinet possessed non-public information or that Citi acted dishonestly, unfairly, or improperly in issuing the Analyst Report. Thus, the Court hereby affirms its decision granting Citi's summary judgment motion on the tortious interference claim.

Finally, turning to the fraud claims -- fraudulent misrepresentation and fraudulent concealment -- the Court on summary judgment concluded that Terra Firma had proffered sufficient evidence to survive summary judgment on these claims, and since these claims subsequently went to trial, no purpose would be served by reviewing here the bases for that conclusion. The Court notes, however, that at trial the plaintiffs were unable to sustain their fraudulent concealment claim as against a motion to dismiss that claim made at the conclusion of plaintiffs' case. <u>See</u> Trial Transcript, 11/01/10.

For the foregoing reasons, the Court affirms its previous ruling granting Citi's summary judgment motion with respect to negligent misrepresentation (Count 2) and tortious interference (Count 4) and denying Citi's summary judgment motion with respect to fraudulent misrepresentation and fraudulent concealment (Counts 1 and 3).

_____
JED S. RAKOFF, U.S.D.J.

Dated:   New York, New York
         November 2, 2010